ELROD, SHERIFF, ET AL. *v.* BURNS ET AL.

No. 74–1520.   Argued April 19, 1976—Decided June 28, 1976

348

Brennan, J., announced the judgment of the Court and delivered an opinion, in which White and Marshall, JJ., joined. Stewart, J., filed an opinion concurring in the judgment, in which Blackmun, J., joined, *post*, p. 374. Burger, C. J., filed a dissenting opinion, *post*, p. 375. Powell, J., filed a dissenting opinion, in which Burger, C. J., and Rehnquist, J., joined, *post*, p. 376. Stevens, J., took no part in the consideration or decision of the case.

*Thomas A. Foran* argued the cause for petitioners. With him on the briefs were *Bernard Carey, Paul P. Biebel, Jr., Raymond F. Simon,* and *Robert E. Wiss.*

*John C. Tucker* argued the cause for respondents. With him on the brief was *David Goldberger.**

Mr. Justice Brennan announced the judgment of the Court and delivered an opinion in which Mr. Justice White and Mr. Justice Marshall joined.

This case presents the question whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

I

Respondents brought this suit in the United States District Court for the Northern District of Illinois

---

*Briefs of *amici curiae* urging affirmance were filed by *C. Richard Johnson* for the Independent Voters of Illinois et al.; and by *Joseph L. Rauh, Jr., John Silard,* and *Alan B. Morrison* for Public Citizen.

against petitioners, Richard J. Elrod, Richard J. Daley, the Democratic Organization of Cook County, and the Democratic County Central Committee of Cook County. Their complaint alleged that they were discharged or threatened with discharge solely for the reason that they were not affiliated with or sponsored by the Democratic Party. They sought declaratory, injunctive, and other relief for violations of the First and Fourteenth Amendments and 42 U. S. C. §§ 1983, 1985, 1986, 1988. Finding that the respondents failed to make an adequate showing of irreparable injury, the District Court denied their motion for a preliminary injunction and ultimately dismissed their complaint for failure to state a claim upon which relief could be granted. The United States Court of Appeals for the Seventh Circuit, relying on *Illinois State Employees Union* v. *Lewis,* 473 F. 2d 561 (CA7 1972), reversed and remanded, holding that respondents' complaint stated a legally cognizable claim. The Court of Appeals instructed the District Court to enter appropriate preliminary injunctive relief. 509 F. 2d 1133 (1975). We granted certiorari. 423 U. S. 821. We affirm.[1]

## II

In December 1970, the Sheriff of Cook County, a Republican, was replaced by Richard Elrod, a Democrat. At that time, respondents, all Republicans, were employees of the Cook County Sheriff's Office. They were non-civil-service employees and, therefore, not covered by any statute, ordinance, or regulation protecting them from arbitrary discharge. One respondent, John Burns, was Chief Deputy of the Process Division and supervised all departments of the Sheriff's Office working on the

---

[1] For purposes of our review, all of the well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.

seventh floor of the building housing that office. Frank Vargas was a bailiff and security guard at the Juvenile Court of Cook County. Fred L. Buckley was employed as a process server in the office. Joseph Dennard was an employee in the office.

It has been the practice of the Sheriff of Cook County, when he assumes office from a Sheriff of a different political party, to replace non-civil-service employees of the Sheriff's Office with members of his own party when the existing employees lack or fail to obtain requisite support from, or fail to affiliate with, that party. Consequently, subsequent to Sheriff Elrod's assumption of office, respondents, with the exception of Buckley, were discharged from their employment solely because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders. Buckley is in imminent danger of being discharged solely for the same reasons. Respondents allege that the discharges were ordered by Sheriff Elrod under the direction of the codefendants in this suit.

## III

At the outset, we are met with objections to our consideration of this case based on the political-question doctrine and the principle of separation of powers. These objections need not long detain us.

A question presented to this Court for decision is properly deemed political when its resolution is committed by the Constitution to a branch of the Federal Government other than this Court. *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). Thus, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" *Id.,* at 210. That matters related to a State's, or even the Federal Government's, elective process are implicated by

this Court's resolution of a question is not sufficient to justify our withholding decision of the question. In particular, in this case, we are asked only to determine whether the politically motivated discharge of employees of the Cook County Sheriff's Office comports with the limitations of the First and Fourteenth Amendments. This involves solely a question of constitutional interpretation, a function ultimately the responsibility of this Court. *Id.*, at 211. See *Powell* v. *McCormack*, 395 U. S. 486, 518–549 (1969). Petitioners do not, and could not, argue that a decision as to the constitutionality of the Sheriff's practices should be left to Congress or the President. The political-question doctrine, therefore, is no obstacle to judicial review in this case. See *Williams* v. *Rhodes*, 393 U. S. 23, 28 (1968).

Petitioners also object that our review of this case will offend the principle of separation of powers, for the executive's responsibility to insure that the laws be faithfully executed requires the power of appointment or removal at will, unimpaired by any judicial oversight. They cite *Myers* v. *United States*, 272 U. S. 52 (1926), in support of their argument. The short answer to this argument is that the separation-of-powers principle, like the political-question doctrine, has no applicability to the federal judiciary's relationship to the States. The matter in *Myers* itself was limited to the permissibility of restraints imposed by Congress on the President concerning the removal of the executive officers. More fundamentally, however, the answer to petitioners' objection is that there can be no impairment of executive power, whether on the state or federal level, where actions pursuant to that power are impermissible under the Constitution. Where there is no power, there can be no impairment of power. And our determination of the limits on state executive power contained in the Constitution

is in proper keeping with our primary responsibility of interpreting that document. It is to such a determination that we now turn.

## IV

The Cook County Sheriff's practice of dismissing employees on a partisan basis is but one form of the general practice of political patronage.[2] The practice also includes placing loyal supporters in government jobs that may or may not have been made available by political discharges. Nonofficeholders may be the beneficiaries of lucrative government contracts for highway construction, buildings, and supplies. Favored wards may receive improved public services. Members of the judiciary may even engage in the practice through the appointment of receiverships, trusteeships, and refereeships. Although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons.

Patronage practice is not new to American politics. It has existed at the federal level at least since the Presidency of Thomas Jefferson,[3] although its popularization and legitimation primarily occurred later, in the Presidency of Andrew Jackson.[4] The practice is not unique to American politics. It has been used in many European countries,[5] and in darker times, it played a significant role in the Nazi rise to power in Germany and other totalitarian states.[6] More recent times have wit-

---

[2] M. Tolchin & S. Tolchin, To the Victor 5-6 (1971).

[3] Id., at 323.

[4] Id., at 323–326.

[5] See C. Fish, The Civil Service and the Patronage 87, 209–210 (1904); D. Rosenbloom, Federal Service and the Constitution 238–240 (1971).

[6] C. Friedrich & Z. Brzezinski, Totalitarian Dictatorship and Autocracy 183–188 (rev. ed. 1965).

nessed a strong decline in its use, particularly with respect to public employment. Indeed, only a few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act,[7] the foundation of modern civil service. And on the state and local levels, merit systems have increasingly displaced the practice.[8] This trend led the Court to observe in *CSC* v. *Letter Carriers,* 413 U. S. 548, 564 (1973), that "the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences."

The decline of patronage employment is not, of course, relevant to the question of its constitutionality. It is the practice itself, not the magnitude of its occurrence, the constitutionality of which must be determined. Nor for that matter does any unacceptability of the practice signified by its decline indicate its unconstitutionality. Our inquiry does not begin with the judgment of history, though the actual operation of a practice viewed in retrospect may help to assess its workings with respect to constitutional limitations. Compare *Brown* v. *Board of Education,* 347 U. S. 483 (1954), with

---

[7] Act of Jan. 16, 1883, c. 27, § 2 (2) Fifth, Sixth, 22 Stat. 404.

[8] See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 604–605, n. 2 (1973). Factors contributing to the declining use of patronage have not been limited to the proliferation of merit systems. New methods of political financing, the greater necessity of job expertise in public employment, growing issue orientation in the elective process, and new incentives for political campaigners have also contributed. Sorauf, The Silent Revolution In Patronage, 20 Pub. Admin. Rev. 28, 34 (1960).

*Plessy* v. *Ferguson,* 163 U. S. 537 (1896). Rather, inquiry must commence with identification of the constitutional limitations implicated by a challenged governmental practice.[9]

# V

The cost of the practice of patronage is the restraint it places on freedoms of belief and association. In order to maintain their jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives. Regardless of the incumbent party's identity, Democratic or otherwise, the consequences for association and belief are the same. An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk. The financial and campaign assistance that he is induced to provide to another party furthers the advancement of that party's policies to the detriment of his party's views and ultimately his own beliefs, and any assessment of his salary is tantamount to coerced belief. See *Buckley* v. *Valeo,* 424 U. S. 1, 19 (1976). Even a pledge of allegiance to another party, however ostensible, only serves to compromise the individual's true beliefs. Since the average public employee is hardly in the financial position to support his party and another, or to lend his time to two parties, the

---

[9] For comprehensive commentary on the constitutionality of the practice of patronage dismissals, see Schoen, Politics, Patronage, and the Constitution, 3 Ind. Legal Forum 35 (1969); Comment, Patronage Dismissals: Constitutional Limits and Political Justification, 41 U. Chi. L. Rev. 297 (1974).

individual's ability to act according to his beliefs and to associate with others of his political persuasion is constrained, and support for his party is diminished.

It is not only belief and association which are restricted where political patronage is the practice. The free functioning of the electoral process also suffers. Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

Our concern with the impact of patronage on political belief and association does not occur in the abstract, for political belief and association constitute the core of those activities protected by the First Amendment.[10] Regardless of the nature of the inducement, whether it be by the denial of public employment or, as in *Board of Education* v. *Barnette,* 319 U. S. 624 (1943), by the influence of a teacher over students, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.,* at 642. And, though

---

[10] "It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." *Board of Education* v. *Barnette,* 319 U. S. 624, 639 (1943).

freedom of belief is central, "[t]he First Amendment protects political association as well as political expression." *Buckley* v. *Valeo, supra,* at 15. "There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. *NAACP* v. *Button,* 371 U. S. 415, 430; *Bates* v. *Little Rock,* 361 U. S. 516, 522–523; *NAACP* v. *Alabama,* 357 U. S. 449, 460–461. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper* v. *Pontikes,* 414 U. S. 51, 56–57 (1973).

These protections reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), a principle itself reflective of the fundamental understanding that "[c]ompetition in ideas and governmental policies is at the core of our electoral process . . . ." *Williams* v. *Rhodes,* 393 U. S., at 32. Patronage, therefore, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment." *Illinois State Employees Union* v. *Lewis,* 473 F. 2d, at 576. As such, the practice unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith.

The Court recognized in *United Public Workers* v. *Mitchell,* 330 U. S. 75, 100 (1947), that "Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office . . . .' " This

principle was reaffirmed in *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), which held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. And in *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 898 (1961), the Court recognized again that the government could not deny employment because of previous membership in a particular party.[11]

Particularly pertinent to the constitutionality of the practice of patronage dismissals are *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967), and *Perry* v. *Sindermann,* 408 U. S. 593 (1972). In *Keyishian,* the Court invalidated New York statutes barring employment merely on the basis of membership in "subversive" organizations. *Keyishian* squarely held that political association alone could not, consistently with the First Amendment, consti-

---

[11] Protection of First Amendment interests has not been limited to invalidation of conditions on government employment requiring allegiance to a particular political party. This Court's decisions have prohibited conditions on public benefits, in the form of jobs or otherwise, which dampen the exercise generally of First Amendment rights, however slight the inducement to the individual to forsake those rights.

In *Torcaso* v. *Watkins,* 367 U. S. 488 (1961), decided the same day as *Cafeteria Workers,* the Court squarely held that a citizen could not be refused a public office for failure to declare his belief in God. More broadly, the Court has held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds. *Pickering* v. *Board of Education,* 391 U. S. 563 (1968). And in *Sherbert* v. *Verner,* 374 U. S. 398 (1963), unemployment compensation, rather than public employment, was the government benefit which could not be withheld on the condition that a person accept Saturday employment where such employment was contrary to religious faith. Similarly, the First Amendment prohibits limiting the grant of a tax exemption to only those who affirm their loyalty to the State granting the exemption. *Speiser* v. *Randall,* 357 U. S. 513 (1958).

tute an adequate ground for denying public employment.[12]  In *Perry*, the Court broadly rejected the validity of limitations on First Amendment rights as a condition to the receipt of a governmental benefit, stating that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to 'produce a result which [it] could not command directly.'  *Speiser* v. *Randall*, 357 U. S. 513, 526.  Such interference with constitutional rights is impermissible." 408 U. S., at 597.

Patronage practice falls squarely within the prohibitions of *Keyishian* and *Perry*.  Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party.  The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which government may not ordain directly are achieved by indirection.[13]  And

---

[12] Thereafter, *United States* v. *Robel*, 389 U. S. 258 (1967), similarly held that mere membership in the Communist Party could not bar a person from employment in private defense establishments important to national security.

[13] The increasingly pervasive nature of public employment provides officials with substantial power through conditioning jobs on partisan support, particularly in this time of high unemployment. Since the government, however, may not seek to achieve an unlawful end either directly or indirectly, the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated.  Rights are infringed

regardless of how evenhandedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains.

## VI

Although the practice of patronage dismissals clearly infringes First Amendment interests, our inquiry is not at an end, for the prohibition on encroachment of First Amendment protections is not an absolute. Restraints are permitted for appropriate reasons. *Keyishian* and *Perry*, however, not only serve to establish a presumptive prohibition on infringement, but also serve to dispose of one suggested by petitioners' reference to this Court's affirmance by an equally divided court in *Bailey* v. *Richardson*, 341 U. S. 918 (1951), aff'g 86 U. S. App. D. C. 248, 182 F. 2d 46 (1950).[14] That is the notion that because there is no right to a government benefit, such as public employment, the benefit may be denied for any reason. *Perry*, however, emphasized that "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may

---

both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason.

Petitioners contend that even though the government may not provide that public employees may retain their jobs only if they become affiliated with or provide support for the in-party, respondents here have waived any objection to such requirements. The difficulty with this argument is that it completely swallows the rule. Since the qualification may not be constitutionally imposed absent an appropriate justification, to accept the waiver argument is to say that the government may do what it may not do. A finding of waiver in this case, therefore, would be contrary to our view that a partisan job qualification abridges the First Amendment.

[14] Brief for Petitioners 12–13.

deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." 408 U. S., at 597. *Perry* and *Keyishian* properly recognize one such impermissible reason: The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly. " '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " *Keyishian* v. *Board of Regents,* 385 U. S., at 605–606. "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert* v. *Verner,* 374 U. S. 398, 404 (1963). " '[T]his Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege." ' " *Sugarman* v. *Dougall,* 413 U. S. 634, 644 (1973) (quoting *Graham* v. *Richardson,* 403 U. S. 365, 374 (1971)).[15]

---

[15] See also *Board of Regents* v. *Roth,* 408 U. S. 564, 571 n. 9 (1972):

"In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a 'privilege,' not a 'right,' and that procedural due process guarantees therefore were inapplicable. *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46, aff'd by an equally divided Court, 341 U. S. 918. The basis of this holding has been thoroughly undermined in the ensuing years. For, as MR. JUSTICE BLACKMUN wrote for the Court only last year, 'this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege." ' *Graham* v. *Richardson,* 403 U. S. 365, 374. See, *e. g., Morrissey* v. *Brewer, ante,* at 482; *Bell* v. *Burson,* [402 U. S. 535,] 539; *Goldberg* v. *Kelly,* [397 U. S. 254,] 262; *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6; *Pickering* v. *Board of Education,* 391 U. S. 563, 568; *Sherbert* v. *Verner,* 374 U. S. 398, 404."

While the right-privilege distinction furnishes no ground on which to justify patronage, petitioners raise several other justifications requiring consideration. Before examining those justifications, however, it is necessary to have in mind the standards according to which their sufficiency is to be measured. It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. *Buckley* v. *Valeo,* 424 U. S., at 64–65; *NAACP* v. *Alabama,* 357 U. S. 449, 460–461 (1958). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct . . . ." *Buckley* v. *Valeo, supra,* at 65. Thus encroachment "cannot be justified upon a mere showing of a legitimate state interest." *Kusper* v. *Pontikes,* 414 U. S., at 58. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. *Buckley* v. *Valeo, supra,* at 94; *Williams* v. *Rhodes,* 393 U. S., at 31–33; *NAACP* v. *Button,* 371 U. S. 415, 438, 444 (1963); *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960); *NAACP* v. *Alabama, supra,* at 464–466; *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945). In the instant case, care must be taken not to confuse the interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. *Sherbert* v. *Verner, supra,* at 406. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, see *United Public Workers* v. *Mitchell,* 330 U. S., at 96,[16] and the government must "emplo[y] means

---

[16] "[T]his Court must balance the extent of the guarantees of

closely drawn to avoid unnecessary abridgment . . . ." *Buckley* v. *Valeo, supra,* at 25. "[A] State may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper* v. *Pontikes, supra,* at 59 (citations omitted). See *United States* v. *Robel,* 389 U. S. 258 (1967); *Shelton* v. *Tucker,* 364 U. S. 479 (1960). In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.[17]

---

freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of government." *United Public Workers* v. *Mitchell,* 330 U. S., at 96.

[17] The Court's decision in *United States* v. *O'Brien,* 391 U. S. 367 (1968), does not support petitioners. *O'Brien* dealt with the constitutionality of laws regulating the "nonspeech" elements of expressive conduct. No such regulation is involved here, for it is association and belief *per se,* not any particular form of conduct, which patronage seeks to control. Moreover, while partisanship may involve activities such as registering with a political organization, wearing a campaign button, or contributing to a campaign fund, we cannot say these activities can be equated with such conduct as destruction of a draft card which was involved in *O'Brien.* See *Buckley* v. *Valeo,* 424 U. S. 1, 17 (1976). Finally, to paraphrase the Court's observations in *Buckley:* "Even if the categorization of [partisan activity] as conduct were accepted, the limitations challenged here would not meet the *O'Brien* test because the gov-

One interest which has been offered in justification of patronage is the need to insure effective government and the efficiency of public employees. It is argued that employees of political persuasions not the same as that of the party in control of public office will not have the incentive to work effectively and may even be motivated to subvert the incumbent administration's efforts to govern effectively. We are not persuaded. The inefficiency resulting from the wholesale replacement of large numbers of public employees every time political office changes hands belies this justification. And the prospect of dismissal after an election in which the incumbent party has lost is only a disincentive to good work.[18] Further, it is not clear that dismissal in order to make room for a patronage appointment will result in replacement

ernmental interests advanced in support of the [practice of patronage] involve 'suppressing communication.' " *Id.*, at 17. For the end to be furthered by the practice involves the compulsion of support for the incumbent political party. Indeed, unlike the legislation tested in *Buckley*, the practice of patronage does "focus on the ideas expressed by persons or groups subjected to [it] . . . ." *Ibid.* And, contrary to *O'Brien*'s proscription, under patronage "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." 391 U. S., at 382.

[18] It does not appear that efficiency and effective government were the concerns of elected officials in this case. Employees originally dismissed were reinstated after obtaining sponsorship letters, a practice hardly promotive of efficiency if the employee's work had been less than par or if the employee had previously behaved in an insubordinate manner. App. 14. Complaints by one supervisor that too many people were being discharged too fast, without adequately trained replacements, were met with the response that the number of dismissals was to be maintained because the job openings were needed for partisan appointments. *Id.*, at 15. One Republican employee of the Sheriff's Office was told that his dismissal had nothing to do with the quality of his work, but that his position was needed for a Democratic replacement. *Id.*, at 22.

by a person more qualified to do the job since appointment often occurs in exchange for the delivery of votes, or other party service, not job capability. More fundamentally, however, the argument does not succeed because it is doubtful that the mere difference of political persuasion motivates poor performance; nor do we think it legitimately may be used as a basis for imputing such behavior. The Court has consistently recognized that mere political association is an inadequate basis for imputing disposition to ill-willed conduct. See *Keyishian* v. *Board of Regents,* 385 U. S., at 606–608; *Elfbrandt* v. *Russell,* 384 U. S. 11, 19 (1966); *Wieman* v. *Updegraff,* 344 U. S., at 190–191.[19] Though those cases involved affiliation with the Communist Party, we do not "con-

---

[19] In this regard, petitioners' reliance on *American Communications Assn.* v. *Douds,* 339 U. S. 382 (1950), is misplaced. To be sure, that decision upheld a section of the National Labor Relations Act denying certain benefits of the Act to labor organizations which had not filed with the National Labor Relations Board affidavits that their leaders were not members of the Communist Party. The Court there deferred to a legislative determination that, with respect to labor relations, the Communist Party was unlike other parties in its use of union leadership to bring about strikes and other obstructions to commerce. The Court was careful to note in *Douds,* however, that the precise holding in that case would not serve as a departure point for inferences of ill conduct grounded merely on political association. *Id.,* at 410. Indeed, the Court in *Douds* also carefully observed that political affiliations and beliefs "are circumstances ordinarily irrelevant to permissible subjects of government action." *Id.,* at 391.

Those caveats were well stated. With but three exceptions shortly after *Douds, Adler* v. *Board of Education,* 342 U. S. 485 (1952); *Garner* v. *Los Angeles Board,* 341 U. S. 716 (1951); and *Gerende* v. *Board of Supervisors,* 341 U. S. 56 (1951), the Court's decisions have consistently rejected all inferences based merely on belief and association, and we do so today. See, *e. g., Keyishian* v. *Board of Regents,* 385 U. S., at 606–608; *Wieman* v. *Updegraff,* 344 U. S., at 188–190.

sider these [respondents'] interest in freely associating with members of the [Republican] Party less worthy of protection than [other] employees' interest in associating with Communists or former Communists." *Illinois State Employees Union* v. *Lewis,* 473 F. 2d, at 570. At all events, less drastic means for insuring government effectiveness and employee efficiency are available to the State. Specifically, employees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist.

Even if the first argument that patronage serves effectiveness and efficiency be rejected, it still may be argued that patronage serves those interests by giving the employees of an incumbent party the incentive to perform well in order to insure their party's incumbency and thereby their jobs. Patronage, according to the argument, thus makes employees highly accountable to the public. But the ability of officials more directly accountable to the electorate to discharge employees for cause and the availability of merit systems, growth in the use of which has been quite significant, convince us that means less intrusive than patronage still exist for achieving accountability in the public work force and, thereby, effective and efficient government. The greater effectiveness of patronage over these less drastic means, if any, is at best marginal, a gain outweighed by the absence of intrusion on protected interests under the alternatives.

The lack of any justification for patronage dismissals as a means of furthering government effectiveness and efficiency distinguishes this case from *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973), and *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1949). In both of those cases, legislative restraints on political management and campaigning by public employees were upheld despite their encroachment on First Amendment rights

because, *inter alia,* they did serve in a necessary manner to foster and protect efficient and effective government.[20]   Interestingly, the activities that were restrained by the legislation involved in those cases are characteristic of patronage practices.   As the Court observed in *Mitchell:* "The conviction that an actively partisan governmental personnel threatens good administration has deepened since [1882].   Congress recognizes danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections."   330 U. S., at 97–98.

A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.   The justification is not without force, but is nevertheless inadequate to validate patronage wholesale.   Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end.   Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.

No clear line can be drawn between policymaking and nonpolicymaking positions.   While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position.   The nature of the responsibilities is critical.   Employee supervisors, for

---

[20] Legislative restraints on political management and campaigning were also upheld in *Letter Carriers* and *Mitchell* because they served to protect individual belief and association and, thereby, the political process.   The distinction between this case and those cases in that respect is treated *infra,* this page and at 368–371.

example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus, the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." *Illinois State Employees Union* v. *Lewis,* 473 F. 2d, at 574. Since, as we have noted, it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent.

It is argued that a third interest supporting patronage dismissals is the preservation of the democratic process. According to petitioners, " 'we have contrived no system for the support of party that does not place considerable reliance on patronage. The party organization makes a democratic government work and charges a price for its services.' " [21] The argument is thus premised on the centrality of partisan politics to the democratic process.

Preservation of the democratic process is certainly an interest protection of which may in some instances justify limitations on First Amendment freedoms. See *Buckley* v. *Valeo,* 424 U. S. 1 (1976); *CSC* v. *Letter Carriers, supra; Williams* v. *Rhodes,* 393 U. S. 23 (1968); *United Public Workers* v. *Mitchell, supra.* But however im-

---

[21] Brief for Petitioners 43, quoting V. Key, Politics, Parties and Pressure Groups 369 (5th ed. 1964).

portant preservation of the two-party system or any system involving a fixed number of parties may or may not be,[22] *Williams* v. *Rhodes, supra,* at 32, we are not persuaded that the elimination of patronage practice or, as is specifically involved here, the interdiction of patronage dismissals, will bring about the demise of party politics. Political parties existed in the absence of active patronage practice prior to the administration of Andrew Jackson, and they have survived substantial reduction in their patronage power through the establishment of merit systems.[23]

Patronage dismissals thus are not the least restrictive alternative to achieving the contribution they may make to the democratic process.[24] The process functions as well without the practice, perhaps even better, for patronage dismissals clearly also retard that process. Patronage can result in the entrenchment of one or a few parties to the exclusion of others. And most indisputably, as we recognized at the outset, patronage is a very effective impediment to the associational and speech freedoms which

---

[22] Partisan politics bears the imprimatur only of tradition, not the Constitution.

"It may be correct that the patronage system has been followed for 'almost two hundred years' and therefore was in existence when the Constitution was adopted. However, the notoriety of the practice in the administration of Andrew Jackson in 1828 implies that it was not prevalent theretofore; we are not aware of any discussion of the practice during the drafting of the Constitution or the First Amendment. In any event, if the age of a pernicious practice were a sufficient reason for its continued acceptance, the constitutional attack on racial discrimination would, of course, have been doomed to failure." *Illinois State Employees Union* v. *Lewis,* 473 F. 2d 561, 568 n. 14 (CA7 1972).

[23] Sorauf, The Silent Revolution in Patronage, 20 Pub. Admin. Rev. 28, 32–33 (1960); Sorauf, Patronage and Party, 3 Midwest J. Pol. Sci. 115, 118–120 (1959).

[24] See n. 8, *supra.*

are essential to a meaningful system of democratic government. Thus, if patronage contributes at all to the elective process, that contribution is diminished by the practice's impairment of the same. Indeed, unlike the gain to representative government provided by the Hatch Act in *CSC* v. *Letter Carriers, supra,* and *United Public Workers* v. *Mitchell, supra,* the gain to representative government provided by the practice of patronage, if any, would be insufficient to justify its sacrifice of First Amendment rights.[25]

To be sure, *Letter Carriers* and *Mitchell* upheld Hatch Act restraints sacrificing political campaigning and man-

---

[25] The Court's decision earlier this term in *Buckley* v. *Valeo,* 424 U. S. 1 (1976), is not contrary. It is true that in *Buckley,* as here, the interest to be served was the democratic system, and accordingly in *Buckley,* the infringement of some First Amendment rights was held to be tolerable. In *Buckley,* however, unlike here, the disclosure and contribution limitations on campaign financing, which were upheld, were essential to eliminating the grave evil of improper influence in the political process. The Court found that those provisions "constitute the Act's primary weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions." *Id.,* at 58. The Court further found that "[t]he contribution ceilings . . . serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Ibid.* With respect to expenditure limitations, however, which were not upheld, the Court found: "These provisions place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." *Id.,* at 58–59. The restrictions imposed by patronage dismissals, limiting wholesale an individual's political beliefs, expression, and association, while perhaps less direct, are equally, if not more, substantial, and therefore also intolerable to the First Amendment. Moreover, patronage dismissals involve the evil of influence, whose very need for elimination justified the contribution and disclosure provisions in *Buckley.*

agement, activities themselves protected by the First
Amendment. But in those cases it was the Court's
judgment that congressional subordination of those ac-
tivities was permissible to safeguard the core interests
of individual belief and association.[26] Subordination of
some First Amendment activity was permissible to pro-
tect other such activity. Today, we hold that subordi-
nation of other First Amendment activity, that is, pa-
tronage dismissals, not only is permissible, but also is
mandated by the First Amendment. And since patron-
age dismissals fall within the category of political cam-
paigning and management, this conclusion irresistibly
flows from *Mitchell* and *Letter Carriers.* For if the First
Amendment did not place individual belief and associa-
tion above political campaigning and management, at
least in the setting of public employment, the restraints
on those latter activities could not have been judged per-
missible in *Mitchell* and *Letter Carriers.*[27]

It is apparent that at bottom we are required to engage
in the resolution of conflicting interests under the First
Amendment. The constitutional adjudication called for

---

[26] "To declare that the present supposed evils of political activity
are beyond the power of Congress to redress would leave the nation
impotent to deal with what many sincere men believe is a material
threat to the democratic system." *United Public Workers* v.
*Mitchell,* 330 U. S., at 99. "Congress may reasonably desire to limit
party activity of federal employees so as to avoid a tendency toward
a one-party system." *Id.,* at 100.

[27] The judgment that the First Amendment interests in political
campaigning and management must, in the setting of public employ-
ment, give way to the First Amendment interests in individual belief
and association does not necessarily extend to other contexts. Re-
straining political campaigning and management in the area of
public employment leaves it free to continue in other settings. The
consequence of no such restraint, however, is the complete restriction
of individual belief and association for each public employee affected.

by this task is well within our province.[28] The illuminating source to which we turn in performing the task is the system of government the First Amendment was intended to protect, a democratic system whose proper functioning is indispensably dependent on the unfettered judgment of each citizen on matters of political concern. Our decision in obedience to the guidance of that source does not outlaw political parties or political campaigning and management. Parties are free to exist and their concomitant activities are free to continue. We require only that the rights of every citizen to believe as he will and to act and associate according to his beliefs be free to continue as well.

In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions. Finally, patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics since political parties are nurtured by other, less intrusive and

---

[28] *Letter Carriers* did observe: "Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U. S., at 564. Though Congress may be free not to impose restraints on political campaigning and management in the public employment sector, we are not similarly free to do so where those practices, protected as they may be in other contexts, are found impermissibly to pre-empt equally, if not more, fundamental constitutional rights.

equally effective methods. More fundamentally, however, any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms. We hold, therefore, that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments, and that respondents thus stated a valid claim for relief.

## VII

There remains the question whether the issuance of a preliminary injunction was properly directed by the Court of Appeals. The District Court predicated its denial of respondents' motion for a preliminary injunction on its finding that the allegations in their complaints and affidavits did not constitute a sufficient showing of irreparable injury and that respondents had an adequate remedy at law. The Court of Appeals held, however: "Inasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." 509 F. 2d, at 1136. We agree.

At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. See *New York Times Co.*

v. *United States,* 403 U. S. 713 (1971).[29]   Since such in-
jury was both threatened and occurring at the time of
respondents' motion and since respondents sufficiently
demonstrated a probability of success on the merits, the
Court of Appeals might properly have held that the Dis-
trict Court abused its discretion in denying preliminary
injunctive relief.   See *Bantam Books, Inc.* v. *Sullivan,*
372 U. S. 58, 67 (1963).

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEVENS did not participate in the con-
sideration or decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACK-
MUN joins, concurring in the judgment.

Although I cannot join the plurality's wide-ranging
opinion, I can and do concur in its judgment.

This case does not require us to consider the broad
contours of the so-called patronage system, with all its
variations and permutations.   In particular, it does not
require us to consider the constitutional validity of a
system that confines the hiring of some governmental
employees to those of a particular political party, and I
would intimate no views whatever on that question.

---

[29] The timeliness of political speech is particularly important.  See
*Carroll* v. *Princess Anne,* 393 U. S. 175, 182 (1968); *Wood* v.
*Georgia,* 370 U. S. 375, 391–392 (1962).

"[T]he purpose of the First Amendment includes the need . . . 'to
protect parties in the free publication of matters of public concern,
to secure their right to a free discussion of public events and public
measures, and to enable every citizen at any time to bring the
government and any person in authority to the bar of public opinion
by any just criticism upon their conduct in the exercise of the
authority which the people have conferred upon them.' "   *Id.,* at
392 (quoting 2 T. Cooley, Constitutional Limitations 885 (8th
ed. 1927)).

The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot. See *Perry* v. *Sindermann*, 408 U. S. 593, 597–598.

MR. CHIEF JUSTICE BURGER, dissenting.

The Court's decision today represents a significant intrusion into the area of legislative and policy concerns—the sort of intrusion MR. JUSTICE BRENNAN has recently protested in other contexts. I therefore join MR. JUSTICE POWELL's dissenting opinion, and add a few words simply to emphasize an aspect that seems particularly important to me.

The Illinois Legislature has pointedly decided that roughly half of the Sheriff's staff shall be made up of tenured career personnel and the balance left exclusively to the choice of the elected head of the department. The Court strains the rational bounds of First Amendment doctrine and runs counter to longstanding practices that are part of the fabric of our democratic system to hold that the Constitution *commands* something it has not been thought to require for 185 years. For all that time our system has wisely left these matters to the States and, on the federal level, to the Congress. The Court's action is a classic example of trivializing constitutional adjudication—a function of the highest importance in our system.

Only last week, in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), we took steps to arrest the downgrading of States to a role comparable to the departments of France, governed entirely out of the national capital. Constant inroads on the powers of the States

to manage their own affairs cannot fail to complicate our system and centralize more power in Washington. For the reasons MR. JUSTICE POWELL persuasively adduces, the First Amendment neither requires nor justifies such inroads in this case. In my view, the issue is not so much whether the patronage system is "good" or "bad," as the plurality characterizes the problem, but whether the choice of its use in the management of the very government of each State was not, in the words of the Tenth Amendment, "reserved to the States . . . or to the people."

Congress long ago, as a matter of policy, opted for a federal career service with a small number of purely political appointments in the Executive Branch, and many governmental departments have a limited number of positions in which the persons appointed have no tenure but serve at the pleasure of the cabinet officer or agency chief, who in turn serves at the pleasure of the President. See, e. g., Leonard v. Douglas, 116 U. S. App. D. C. 136, 321 F. 2d 749 (1963). The considerations leading to these legislative conclusions are—for me—not open to judicial scrutiny under the guise of a First Amendment claim, any more than is the right of a newly elected Representative or Senator, for example, to have a staff made up of persons who share his political philosophy and affiliation and are loyal to him. It seems to me that the Illinois Legislature's choice is entitled to no less deference.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The Court holds unconstitutional a practice as old as the Republic, a practice which has contributed significantly to the democratization of American politics. This decision is urged on us in the name of First Amendment rights, but in my view the judgment neither is constitu-

tionally required nor serves the interest of a representative democracy. It also may well disserve—rather than promote—core values of the First Amendment. I therefore dissent.

## I

The Cook County Sheriff's Office employs approximately 3,000 people. Roughly half of these employees are "merit" employees given various protections from discharge. The other half of the employees have no such protection. Customary Illinois political practice has allowed such "nonmerit" positions to be awarded on "patronage" grounds. This tradition has entitled newly elected officeholders to replace incumbent nonmerit employees with patronage appointments.

Petitioner Richard Elrod, a Democrat, was elected Sheriff of Cook County in 1970, succeeding a Republican. Consistently with Illinois practice, he dismissed a number of incumbent employees because they lacked Democratic affiliation and were unable to secure Democratic sponsorship. The named respondents, several discharged employees and another employee threatened with discharge, are all Republicans who concededly were hired by Elrod's predecessor because of their political affiliations.

## II

As the plurality opinion recognizes, patronage practices of the sort under consideration here have a long history in America.[1] Although an extensive recounting of that history is not necessary, I think it important to

---

[1] Substantially for the reasons stated in the plurality opinion, I agree that the question presented here is a justiciable one. I note, however, that the ability to formulate judicial standards is another factor to be considered in evaluating justiciability. *Baker* v. *Carr*, 369 U. S. 186 (1962). The difficulty of formulating standards might pose a bar to judicial review of some patronage practices not before us.

survey it more fully than does the plurality opinion.[2] The observation that patronage in employment received its primary popularization and legitimation during Jackson's Presidency, *ante*, at 353, understates the historical antecedents of the practice, which stretch back to Washington's Presidency.

Partisan politics, as we now know them, did not assume a prominent role in national politics immediately after the adoption of the Constitution. Nonetheless, Washington tended to confine appointments even of customs officials and postmasters to Federalists, as opposed to anti-Federalists. As the role of parties expanded, partisan considerations quickly influenced employment decisions. John Adams removed some Republicans from minor posts, and Jefferson, the first President to succeed a President of an opposing party, made significant patronage use of the appointment and removal powers. The administrations of Madison, Monroe, and John Quincy Adams provided no occasion for conspicuous patronage practice in employment, as each succeeded a copartisan. Jackson, of course, used patronage extensively when he became the first President since Jefferson to succeed an antagonistic administration.

It thus appears that patronage employment practices emerged on the national level at an early date, and that they were conspicuous during Jackson's Presidency largely because of their necessary dormancy during the long succession of Republican Presidents. During that period, however, patronage in hiring was practiced widely in the States, especially in New York and Pennsylvania. This afforded a theoretical and popular legitimacy to patronage, helping to lay the groundwork for acceptance of Jackson's actions on the national level.

---

[2] The sources primarily relied upon for the statements in text are C. Fish, The Civil Service and the Patronage (1905), and D. Rosenbloom, Federal Service and the Constitution (1971).

It is recognized that patronage in employment played a significant role in democratizing American politics. See, *e. g.,* C. Fish, The Civil Service and the Patronage 156–157 (1905); Sorauf, Patronage and Party, 3 Midwest J. Pol. Sci. 115–116 (1959). Before patronage practices developed fully, an "aristocratic" class dominated political affairs, a tendency that persisted in areas where patronage did not become prevalent. C. Fish, *supra,* at 157. Patronage practices broadened the base of political participation by providing incentives to take part in the process, thereby increasing the volume of political discourse in society. Patronage also strengthened parties, and hence encouraged the development of institutional responsibility to the electorate on a permanent basis. Parties became "instrument[s] through which discipline and responsibility may be achieved within the Leviathan." Sorauf, *supra,* at 115.

In many situations patronage employment practices also entailed costs to government efficiency. These costs led eventually to reforms placing most federal and state civil service employment on a nonpatronage basis. But the course of such reform is of limited relevance to the task of constitutional adjudication in this case. It is pertinent to note, however, that a perceived impingement on employees' political beliefs by the patronage system was not a significant impetus to such reform. Most advocates of reform were concerned primarily with the corruption and inefficiency that patronage was thought to induce in civil service and the power that patronage practices were thought to give the "professional" politicians who relied on them. D. Rosenbloom, Federal Service and the Constitution 70–74 (1971). Moreover, it generally was thought that elimination of these evils required the imposition both of a merit system and of restrictions on First Amendment activities

by government employees. *Id.*, at 76–77, 82–86; see, *e. g., CSC* v. *Letter Carriers,* 413 U. S. 548 (1973).

## III

It might well be possible to dispose of this case on the ground that it implicates no First Amendment right of the respondents, and therefore that they have failed to state a cause of action. They are employees seeking to avoid discharge—not citizens desiring an opportunity to be hired by the county without regard to their political affiliation or loyalty. Respondents' complaint acknowledges the longstanding existence of the patronage system they now challenge:

> "For many years past and continuing to this time it has been the practice of the elected Sheriff of Cook County, when he assumes office from a Sheriff of a different political party, to replace all or substantially all of the non-civil service employees of the Sheriff's office who did not (a) Pledge their political allegiance to the political party of the incoming Sheriff; [and/or meet other specified political requirements] . . . ." App. 3.

We thus have complaining employees who apparently accepted patronage jobs knowingly and willingly, while fully familiar with the "tenure" practices long prevailing in the Sheriff's Office. Such employees have *benefited* from their political beliefs and activities; they have not been penalized for them. In these circumstances, I am inclined to agree with the holding of the Supreme Court of Pennsylvania in *American Federation of State Employees* v. *Shapp,* 443 Pa. 527, 280 A. 2d 375 (1971), that beneficiaries of a patronage system may not be heard to challenge it when it comes their turn to be replaced. See also *Nunnery* v. *Barber,* 503 F. 2d 1349 (CA4 1974).

The plurality opinion virtually ignores this issue in

an apparent rush to constitutional adjudication. It also may be that the pleadings present an inadequate record on which to decide this matter.[3]  In any event, I am forced to turn to the question addressed by the plurality, even though a full development of the evidence or more carefully drawn pleadings may have justified a disposition on the ground that these respondents cannot challenge the patronage hiring practices.[4]

## IV

The question is whether it is consistent with the First and Fourteenth Amendments for a State to offer some employment conditioned, explicitly or implicitly, on partisan political affiliation and on the political fortunes of the incumbent officeholder.  This is to be determined, as the plurality opinion agrees, by whether patronage hiring practices sufficiently advance important state interests to justify the consequent burdening of First Amendment interests.  *Buckley* v. *Valeo,* 424 U. S. 1, 25 (1976); *ante,* at 360–363.  It is difficult to disagree with the view, as an abstract proposition, that government employment ordinarily should not be conditioned upon one's political beliefs or activities.  But we deal

[3] On petitioners' motion to dismiss, the District Court had before it only the complaint and the petitioners' conclusory motions to dismiss.  Although one reasonably may be confident that these employees willingly accepted this employment as political patronage, with full knowledge that their continued employment depended on the outcome of the next election, this may not be entirely clear from the pleadings as viewed upon a motion to dismiss.  The District Court made no finding of fact in this respect, and its brief opinion does not rely on this ground.

[4] One may agree readily that different plaintiffs legitimately could assert First Amendment interests.  These would be individuals who desired to be hired for state or local employment and who possessed all requisite qualifications except the "right" political posture or sponsorship.

here with a highly practical and rather fundamental element of our political system, not the theoretical abstractions of a political science seminar. In concluding that patronage hiring practices are unconstitutional, the plurality seriously underestimates the strength of the government interest—especially at the local level—in allowing some patronage hiring practices, and it exaggerates the perceived burden on First Amendment rights.[5]

## A

As indicated above, patronage hiring practices have contributed to American democracy by stimulating political activity and by strengthening parties, thereby helping to make government accountable.[6] It cannot be questioned seriously that these contributions promote important state interests. Earlier this Term we said of the government interest in encouraging political debate:

> "[Public financing of Presidential campaigns] is . . . [an effort] to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Buckley* v. *Valeo supra,* at 92–93 (footnote omitted).

---

[5] This case involves only employees. We thus face no allegations that patronage practices exclude any voters or candidates from effective participation in the political process by impermissibly disadvantaging them. Cf. *Shakman* v. *Democratic Organization of Cook County,* 435 F. 2d 267 (CA7 1970). Elrod informs us that since 1955 two Democrats, two Republicans, and an Independent have served as Sheriff. Reply Brief for Petitioners 11 n. 20a.

[6] Some commentators have believed that patronage hiring practices promote other social interests as well:

"Patronage is peculiarly important for minority groups, involving much more than the mere spoils of office. Each first appointment given a member of any underdog element is a boost in that element's struggle for social acceptance. It means that another barrier to their advance has been lifted, another shut door has swung open."
S. Lubell, The Future of American Politics 76–77 (1952).

"Legislation to enhance these First Amendment values is the rule, not the exception. Our statute books are replete with laws providing financial assistance to the exercise of free speech . . . ." *Id.,* at 93 n. 127.

We also have recognized the strong government interests in encouraging stable political parties and avoiding excessive political fragmentation. Through the medium of established parties the "people . . . are presented with understandable choices and the winner in the general election with sufficient support to govern effectively," *Storer* v. *Brown,* 415 U. S. 724, 735 (1974), while "splintered parties and unrestrained factionalism [might] do significant damage to the fabric of government." *Id.,* at 736. See *Buckley* v. *Valeo, supra,* at 98, 101.

Without analysis, however, the plurality opinion disparages the contribution of patronage hiring practices in advancing these state interests. It merely asserts that such practices cause the "free functioning of the electoral process [to suffer]," *ante,* at 356, and that "we are not persuaded that the elimination of . . . patronage dismissals, will bring about the demise of party politics." *Ante,* at 369. One cannot avoid the impression, however, that even a threatened demise of parties would not trouble the plurality. In my view, this thinking reflects a disturbing insensitivity to the political realities relevant to the disposition of this case.[7]

The complaining parties are or were employees of the Sheriff. In many communities, the sheriff's duties are as routine as process serving, and his election attracts little or no general public interest. In the States, and

---

[7] As this case presents only the question whether a State constitutionally may pursue patronage hiring practices, we do not consider whether such practices would be justified if pursued by the Federal Government.

especially in the thousands of local communities, there are large numbers of elective offices, and many are as relatively obscure as that of the local sheriff or constable. Despite the importance of elective offices to the ongoing work of local governments, election campaigns for lesser offices in particular usually attract little attention from the media, with consequent disinterest and absence of intelligent participation on the part of the public. Unless the candidates for these offices are able to dispense the traditional patronage that has accrued to the offices, they also are unlikely to attract donations of time or money from voluntary groups. In short, the resource pools that fuel the intensity of political interest and debate in "important" elections frequently "could care less" about who fills the offices deemed to be relatively unimportant. Long experience teaches that at this local level traditional patronage practices contribute significantly to the democratic process. The candidates for these offices derive their support at the precinct level, and their modest funding for publicity, from cadres of friends and political associates who hope to benefit if their "man" is elected.[8] The activities of the latter are

---

[8] Former Senator Paul H. Douglas (D. Ill.) said of patronage hiring practices:

"In short, I am for civil service but not for having civil service dominate public employment 100 percent. That would give us the bureaucracy of Germany and France which I do not regard as ideal.

.     .     .     .     .

"But I would like to have you consider just how long most liberals would be able to last in Congress if you stripped us of all patronage, as you desire. We who try to defend the interests of the people, the consumers and the taxpayers commonly face the powerful opposition of the special-interest groups which will spend enormous sums of money to defeat us. . . . If we are to survive we need some support rooted in gratitude for material favors which at the same time do not injure the general public." Letter to New Republic, July 14, 1952, p. 2.

often the principal source of political information for the voting public. The "robust" political discourse that the plurality opinion properly emphasizes is furthered—not restricted—by the time-honored system.

Patronage hiring practices also enable party organizations to persist and function at the local level. Such organizations become visible to the electorate at large only at election time, but the dull periods between elections require ongoing activities: precinct organizations must be maintained; new voters registered; and minor political "chores" performed for citizens who otherwise may have no practical means of access to officeholders. In some communities, party organizations and clubs also render helpful social services.

It is naive to think that these types of political activities are motivated at these levels by some academic interest in "democracy" or other public service impulse. For the most part, as every politician knows, the hope of some reward generates a major portion of the local political activity supporting parties. It is difficult to overestimate the contributions to our system by the major political parties, fortunately limited in number compared to the fractionalization that has made the continued existence of democratic government doubtful in some other countries. Parties generally are stable, high-profile, and permanent institutions. When the names on a long ballot are meaningless to the average voter, party affiliation affords a guidepost by which voters may rationalize a myriad of political choices. Cf. *Buckley* v. *Valeo*, 424 U. S., at 66–68. Voters can and do hold parties to long-term accountability, and it is not too much to say that, in their absence, responsive and responsible performance in low-profile offices, particularly, is difficult to maintain.

It is against decades of experience to the contrary, then, that the plurality opinion concludes that patronage

hiring practices interfere with the "free functioning of the electoral process." *Ante,* at 356. This *ad hoc* judicial judgment runs counter to the judgments of the representatives of the people in state and local governments, representatives who have chosen, in most instances, to retain some patronage practices in combination with a merit-oriented civil service. One would think that elected representatives of the people are better equipped than we to weigh the need for some continuation of patronage practices in light of the interests above identified,[9] and particularly in view of local conditions.[10] See *CSC* v.

---

[9] The plurality might be taken to concede some promotion of the democratic process by patronage hiring practices but to conclude that in net effect such practices will reduce political debate impermissibly by affecting some employees or potential employees and thereby depriving society of the "unfettered judgment of each citizen on matters of political concern." *Ante,* at 372. In the past the Court has upheld congressional actions designed to increase the overall level of political discourse but affecting adversely the First Amendment interests of some individuals. *Buckley* v. *Valeo,* 424 U. S. 1, 64–68 (1976) (disclosure requirements); *CSC* v. *Letter Carriers,* 413 U. S. 548, 564–566 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 392–395 (1969). In *Letter Carriers* we indicated specifically that the First Amendment freedoms of federal employees could be limited in an effort to further the functioning of the democratic process. I do not believe that local legislative judgments as to what will further the democratic process in light of local conditions should receive less weight than these congressional judgments. Surely that should be the case until we have a record, if one could be created, showing the fears of the plurality to be justified.

[10] The judgment today is limited to nonpolicymaking positions. *Ante,* at 367–368. A "policymaking" exception, however, will not allow substantial advancement of the state interests undercut by the Court's holding, as it is doubtful that any significant number of employees can be identified as policymakers in a sheriff's office. States have chosen to provide for the election of many local officials who have little or no genuine policymaking functions, see *supra,* at 383–384, and the subordinates of such officials are even less likely to

*Letter Carriers,* 413 U. S., at 564; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 99 (1947). Against this background, the assertion in the plurality opinion that "[p]atronage dismissals . . . are not the least restrictive alternative to achieving [any] contribution they may make to the democratic process" is unconvincing, especially since no alternative to some continuation of patronage practices is suggested. *Ante,* at 369 (footnote omitted).

## B

I thus conclude that patronage hiring practices sufficiently serve important state interests, including some interests sought to be advanced by the First Amendment, to justify a tolerable intrusion on the First Amendment interests of employees or potential employees.

The plurality opinion asserts that patronage hiring practices contravene the fundamental principle that " 'no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . .' " *Ante,* at 356, quoting *Board of Education* v. *Barnette,* 319 U. S. 624, 642 (1943). But such practices simply cannot be so construed. This case differs materially from previous cases involving the imposition of political conditions on employment, see, *e. g., Garner* v. *Los Angeles Board,* 341 U. S. 716 (1951), cases where there was an attempt to exclude "a minority group . . . odious to the majority." *Id.,* at 725 (Frankfurter, J., concurring in part and dissenting in part). In that context there was a danger that governmental action was directed toward the elimination of political beliefs

---

have such functions. It thus is predictable that the holding today will terminate almost completely the contributions of patronage hiring practices to the democratic process. The probability of this result is increased to the extent that the needs of efficiency in local government require that policymaking positions be included in a merit-oriented, nonpolitical civil service.

by penalizing adherents to them. But patronage hiring practices have been consistent historically with vigorous ideological competition in the political "marketplace." And even after one becomes a beneficiary, the system leaves significant room for individual political expression. Employees, regardless of affiliation, may vote freely [11] and express themselves on some political issues. See *Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Pickering* v. *Board of Education,* 391 U. S. 563 (1968). The principal intrusion of patronage hiring practices on First Amendment interests thus arises from the coercion on associational choices that may be created by one's desire initially to obtain employment. This intrusion, while not insignificant, must be measured in light of the limited role of patronage hiring in most government employment. The pressure to abandon one's beliefs and associations to obtain government employment—especially employment of such uncertain duration—does not seem to me to assume impermissible proportions in light of the interests to be served.

## V

On the assumption that we must reach the constitutional issue at the behest of respondents, I would hold that a state or local government may elect to condition employment on the political affiliation of a prospective employee and on the political fortunes of the hiring incumbent. History and long-prevailing practice across the country support the view that patronage hiring practices make a sufficiently substantial contribution to the practical functioning of our democratic system to sup-

---

[11] It appears that before the adoption of the Australian ballot, one's access to or retention of a government job sometimes could depend on voting "correctly." D. Rosenbloom, *supra,* n. 2, at 61. Today this ultimate core of political expression is beyond the reach of any coercive effects of the patronage system.

port their relatively modest intrusion on First Amendment interests. The judgment today unnecessarily constitutionalizes another element of American life—an element certainly not without its faults but one which generations have accepted on balance as having merit.[12] We should have heeded, instead, the admonition of Mr. Justice Holmes that "[i]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it . . . ." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922); see *Walz* v. *Tax Comm'n*, 397 U. S. 664, 678 (1970).

---

[12] In concluding that the Constitution does not require the invalidation of state and local patronage systems, I wish to make clear that approval of any particular type of system or of the practice in any particular State, city, or community is not implied. I believe that the prevailing practice is to establish a broad base of merit-oriented civil service, but to leave some room for the operation of traditional patronage. I must say that the "mix" in Cook County (where only about half of the employees in the Sheriff's Office are within the merit system) seems disproportionate. On the other hand, there are smaller communities—*e. g.*, where nonpartisan, council-manager forms of government exist—in which the merit system embraces the vast majority of public employees. Political scientists and students of government differ, and their views also have varied from time to time, as to the best means of structuring state and local government employment in the public interest. Nor is the answer necessarily the same for every community without regard to its size, form of government, or other local conditions. My conviction, as indicated in the opinion above, is that we should not foreclose local options in the name of a constitutional right perceived to be applicable for the first time after nearly two centuries.