Richard LEGG, Plaintiff,

v.

Mayor James T. DELLAVOLPE, And the City of Ansonia Defendants.

No. CIV.3:00CV1495 (JBA).

United States District Court, D. Connecticut.

May 23, 2002.

**53**

Simon I. Allentuch, Neubert, Pepe & Monteith, Nww Haven CT, for plaintiff.

James M. Sconzo, Wendi L. Boyden, Halloran & Sage, Hartford, CT, Thomas P. O'Dea, Jr., Brett Michael Szczesny, Halloran & Sage, Westport, CT, for defendants.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT
### [DOC. # 37, 40]

ARTERTON, District Judge.

Plaintiff Richard Legg was terminated from his position as Director of Administrative Affairs of the City of Ansonia in November 1999. Following his termination, Legg brought this action under 42 U.S.C. § 1983 and Connecticut law. Legg alleges that the City of Ansonia and Mayor James T. DellaVolpe terminated him from his job without any legal basis and without providing him due process of law. Legg claims that he was fired on the basis of his political affiliation, which violated his Fourteenth Amendment right to equal protection under the law and his right to freedom of association under both the First Amendment and Connecticut law. Second, Legg alleges that he was entitled to a pre-termination hearing, including notice and an opportunity to be heard, and a post-termination hearing, which the Ansonia Personnel Manual and the City Charter guarantee to permanent employees of the City. He further argues that his job could be terminated only by the Board of Aldermen and only for cause, as defined in the personnel manual. Legg alleges that the defendants' failure to abide by these procedures violated his due process rights under the Fourteenth Amendment and constitutes a breach of his employment contract with the City of Ansonia. Third, Legg seeks attorney's fees and punitive damages, arguing that the defendants' de-

privation of his civil rights was malicious and intentional. Finally, Legg claims that the defendants improperly withheld accrued sick time in violation of Connecticut law.

The defendants have moved for summary judgment on all of these claims. The essence of their motion is that Legg has insufficient evidence that he was a permanent employee entitled to the procedural safeguards spelled out in the personnel manual. They contend that Legg was an at-will, political appointee and, as such, could lawfully be terminated at the outset of a new mayoral administration. Further, the defendants claim that Legg failed to request his accrued sick time properly, which required a formal written request and the approval of the Board of Aldermen. Finally, on the federal claims, they argue that the plaintiff's claim against the City is not legally viable and that Mayor DellaVolpe is entitled to qualified immunity.

Based on the analysis below, the Court grants the defendants' motion for summary judgment on the plaintiff's federal claims and declines to exercise supplemental jurisdiction over the plaintiff's pendant state law claims.

## I. FACTUAL BACKGROUND

In April 1997, at a regular meeting of the Board of Aldermen, Legg's hiring as the Director of Administrative Affairs was approved, following his nomination to the position by Ansonia Mayor Nancy Valentine, a Republican. Once hired, Legg reported directly to the mayor. In November 1999, DellaVolpe, a Democrat, was elected Mayor of Ansonia. On his first day in office, Mayor DellaVolpe terminated Legg on the grounds that Legg was aligned with Mayor Valentine and he wanted to fill the position with someone from his own administration.

The position of Director of Administrative Affairs was created in February 1996 at the request of Mayor Valentine and it was approved by the Board of Aldermen as a temporary position that would terminate four months later, on June 30, 1996. William Nimmons, the first person to serve in the position, continued in that role well past the period of authorization, until March 27, 1997, although no vote was ever taken by the Board of Aldermen to make the Director of Administrative Affairs a permanent position or even to extend its term. In April 1997, Mayor Valentine offered the position to Legg, who was at that time employed by a temporary employment agency and had been working in the City of Ansonia finance department for approximately four months. After the Board of Aldermen's approval of his appointment, he did not sign any employment contract.

The job description for Director of Administrative Affairs provides the following "general description of the duties" of the position:

As a member of the Mayor's administrative team, initiates and participates in the development of goals, objectives, programs, policies and procedures for the City. Assists the Mayor in planning and directing operations of all City departments and exercises such administrative powers as may be assigned by the Mayor, so long as such does not infringe on authority vested by the Charter in any official, board or commission of the City. Is responsible for coordination and communication among all divisions and departments within City government to promote the effective and efficient delivery of high quality City services. Assumes such duties and responsibilities as changing needs and priorities may require.

Pl.'s Local Rule 9(c)(1) Statement Ex. C. The document describes the Director of Administrative Affairs as "report[ing] to and work[ing] under the general direction of the Mayor" and "supervis[ing] such personnel as the Mayor may designate." *Id.* According to the job description, examples of the duties of the position include:

Administers operating policies in accordance with State statutes, the City Charter and local ordinances. Monitors compliance by City departments with such policies as well as the policies of the Board of Aldermen and other boards.

Recommends new operating polices for adoption by the Mayor and/or Board of Aldermen.

Conducts studies to determine City needs and alternative means of meeting those deeds in a cost effective manner, in such areas as general government administration, fiscal management, public health and welfare, recreation, public works and public safety.

Evaluates and analyzes operations and recommends methods for improving the performance of various City agencies, departments and offices. Assists the Mayor in overseeing implementation of same.

Assists the Mayor in coordinating the work of various City divisions and departments, maintaining communication between the Mayor's office and other City officials, boards, commissions and committees, as well as third parties such as contractors, consultants and insurers.

Oversees planning and implementation of administrative and fiscal goals and objectives.

Provides advice and direction to City personnel on implementation of sound public administration and management principles and practices.

Assists the Mayor in the preparation and presentation of the annual operating budget to the Board of Aldermen for approval.

Reviews and monitors expenditures for compliance with adopted budget.

Coordinates information for and prepares reports of City operations, including but not limited to annual report.

Does other work as required by the Mayor.

*Id.*

In November 1997, Mayor Valentine was re-elected for a second two-year term. In that same month, the position description of Director of Administrative Affairs was revised to eliminate the requirement of a graduate degree. Legg continued to serve as the Director of Administrative Affairs throughout Mayor Valentine's second term. He served in that position until the first day of Mayor DellaVolpe's administration, when Mayor DellaVolpe terminated his employment. Legg sent a letter to DellaVolpe disputing the grounds of his firing. DellaVolpe later named his own nominee to fill the position. Ultimately, the Board of Aldermen eliminated the position in May 2000.

After his termination, Legg filed a complaint with the Connecticut Department of Labor seeking payment of his accrued sick leave. After conducting an investigation, the Wage and Workplace Standards Division sent a letter in September 2000 to Claude Perry, the City of Ansonia personnel director, requesting that the City pay Legg his accrued sick leave. The defendants have not complied with the request. There has been no appeal or other legal action taken related to the Commissioner's investigation and action other than this lawsuit.

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depo-

sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e).

## III. DISCUSSION

### A. First Amendment And Fourteenth Amendment Equal Protection Claims

It is undisputed that Legg was dismissed from his position as Director of Administrative Affairs because of his affiliation with the Republican administration of Nancy Valentine. Valentine's successor, defendant DellaVolpe, a Democrat, told Legg that he wanted someone from his own political party in that position. Legg claims that his dismissal therefore violated his First Amendment rights to freedom of political association and speech, as well as his Fourteenth Amendment right to equal protection under the law.

#### 1. Political patronage dismissals

■ While political patronage dismissals clearly infringe on an employee's First Amendment rights to political belief and association, these rights are not absolute. *Elrod v. Burns*, 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In his plurality opinion in *Elrod*, Justice Brennan noted that it is "firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny." *Id.* at 362, 96 S.Ct. 2673. He explained that the interest advanced must be one of vital importance, and the burden is on the government to show the existence of such an interest. *See id.* (*citing, e.g., Buckley v. Valeo*, 424 U.S. 1, 94, 96 S.Ct. 612, 46 L.Ed.2d 659, (1976)). In assessing justifications for dismissals, the *Elrod* Court reasoned that that "[l]imiting patronage dismissals to policymaking positions is sufficient to achieve th[e] governmental end" of ensuring that new administrations, approved by the electorate, are able to effectively implement their policy agendas. *Id.*

In *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court considered whether the First and Fourteenth Amendments protect a satisfactorily performing assistant public defender from discharge solely because of

his political beliefs. In concluding that his firing was impermissible, the Supreme Court held that "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. 1287. The Supreme Court reasoned that the job of an assistant public defender is to represent individual citizens in controversy with the State, and that party affiliation is an inappropriate requirement for the position.

 The Second Circuit has interpreted *Branti* to stand for the proposition that:
political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance, a reading which would exempt from protection most policymaking and confidential employees, but not—as in the [*Branti* ] Court's example—a football coach at a state university.... Any other decision would severely handicap an incoming administrator's ability ·to carry out his proposed policies, thereby undercutting the effects of the electorate's vote.

*Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir.1988). "In deciding whether there is a rational connection between shared ideology and job performance, 'this court's challenge is to discern the *duties inherent* in the offices held by the plaintiffs'." *Vona v. County of Niagara*, 119 F.3d 201, 207 (2d Cir.1997) (*quoting Gordon v. County of*

*Rockland*, 110 F.3d 886, 888 (2d Cir.1997)) (emphasis in original); *accord Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993) (a court must look at the power with which the position is vested by law, and which is inherent in the office).[1]

Legg argues that shared ideology with the mayor of Ansonia is not rationally connected to the job performance of the Director of Administrative Affairs. To support his claim, he testified that he did not develop any significant policies, that avoided politics "like the plague," and that, while he "occasionally supervised" City staff, no one reported directly to him. Pl.'s Local Rule 9(c)(1) Statement Ex. A, Legg Dep., pp. 80, 45, 52, 54 (hereinafter "Legg Dep."). He further argues that because there are only negligible differences between Valentine and DellaVolpe in terms of their political ideologies and policy goals, political loyalty is an inappropriate barometer for his competence to perform the job effectively. The Court's task, however, is not to assess the role that Legg himself played as Director of Administrative Affairs for Valentine; rather, it is to assess the *duties inherent* in the position.

In *Vona*, the Second Circuit considered whether the job of assistant attorney of the Niagara Department of Social Services was protected by the First Amendment from political patronage dismissals. In concluding that the position was not protected from such firings, the court was unper-

---

1. *See also Williams v. City of River Rouge,* 909 F.2d 151, 154 (6th Cir.1990) ("When examining a public office for first amendment protection against politically-motivated dismissal, the relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office."); *O'Connell v. Gorski,* 715 F.Supp. 1201, 1203 (W.D.N.Y. 1989) ("The determinative inquiry ... is not what functions the public employee actually

performed but rather what duties he was actually empowered to perform and which ones were inherent in the public office he held."). If political loyalty is reasonably connected to performance of the inherent duties of the office, then that office is not protected from patronage dismissals. *See Regan,* 984 F.2d at 580–81 (political loyalty reasonably connected to performance of the job of Deputy Tax Collector based on its inherent duties).

suaded by the plaintiffs' evidence that the prior Commissioner had failed to use the attorneys in a capacity in which shared ideology was necessary:

> Based on the inherent duties of an assistant attorney, the Commissioner for the Niagara County Department of Social Services might wish to rely on these attorneys for legal advice necessary to implement policy encompassing ideological and political concerns. Therefore, while the Commissioner might employ assistant attorneys without regard to shared ideology, our decision here should not prevent her and her successors from using assistant attorneys in tasks requiring shared ideology.

*Vona,* 119 F.3d at 208 (*citing Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981)) ("To elaborate upon one of Justice Stevens' examples [in *Branti* ], while it is conceivable that a governor might employ speech writing assistants without regard to their political affiliation, we would not want to prevent governors in general from using political affiliation as a criterion for such positions"); *see also Williams,* 909 F.2d at 155 (deciding that consideration of individual tasks performed by the plaintiff employed as part-time city attorney "would tend to [improperly] bind a later mayor to employ the City Attorney in the way that the official had been employed in the past").

In the present case, even though as mayor, Valentine may have directed Legg's job to focus on duties that did not require a shared ideology, her successor, Mayor DellaVolpe, should not be precluded from using the described position in a way that did require a shared ideology. Thus, the appropriate focus of the constitutional inquiry is on whether the duties inherent in the job could rationally require that the person occupying the position of Director of Administrative Affairs share a political ideology with the Mayor of Ansonia.

To examine the duties inherent in the position of Director of Administrative Affairs, the defendants urge the Court to consider the job description of the position. The plaintiff argues, however, that because the job description was not formally adopted by the Board of Aldermen and the City Charter states that the Board of Aldermen "prescribe[s] the duties of employees of the City", the job description can have no legal significance. *See* Pl.'s Mem. Opp. Sum. J., p. 15–16; Pl.'s Local 9(c)(1) Statement Ex. E, Charter of the City of Ansonia, Sec. 93. Plaintiff's argument is unpersuasive. First, Mayor Valentine reviewed the job description and testified that it was an accurate summary of the job that she herself persuaded the Board of Aldermen to create. Valentine Dep. at p. 47–48. Second, Legg testified that when Valentine approached him about the job, she handed him the job description to familiarize him with its parameters. Legg Dep. at 32. Therefore, the job description, while not dispositive, is highly relevant to the Court's examination of the inherent duties of the job.

■ The Second Circuit has identified several factors applicable to a determination of whether there is a rational connection between shared ideology and job performance. They are: "whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders." *Vona,* 119 F.3d at 209 (*citing Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir. 1994)). Analysis of these factors must be

made in the context of the power that is inherent in the position. *Id.* No specified number need be present in order to support a "policymaker" finding. In *Vona*, for instance, only three of the eight factors were present, but in the court's view they were powerful enough, under the circumstances, to demonstrate that the plaintiffs were clearly policymakers.

Analysis of these factors as they relate to the duties inherent in the position of Director of Administrative Affairs favors the conclusion that Legg was a policymaker. First, the position is exempt from civil service protection. This is not a dispositive factor, however, as the plaintiff notes that all non-bargaining unit positions were similarly exempt. Second, the position calls for a person with a background in policy-development and implementation, a form of which can require technical competence or expertise. Further, "preparation and presentation of the annual operating budget" and "review[ing] and monitor[ing] expenditures for compliance with adopted budget" also suggest advisability of a background in fiscal policy. Third, the job description expressly notes that the Director "supervises such personnel as the Mayor may designate." The fact that employees may not have reported directly to Legg does not mean that the power was not inherent in his position. Fourth, the duty to "maintain[ ] communication between the Mayor's office and other City officials, boards, commissions, etc." implicitly empowers the Director to be "authorized to speak in the name of policymakers." In fact, Valentine testified that the Director of Administrative Affairs was authorized to speak on her behalf in her absence. Pl.'s Local 9(c)(1) Statement Ex. C, Valentine Dep., p. 101 (hereinafter "Valentine Dep."). In addition, various department heads often met with and reported to Legg when the Mayor was not available. Pl.'s Local 9(c)(1) Statement Ex. B, Perry Dep., p 55 (hereinafter "Perry Dep."). With reference to factors five and six, based on the Director's duty to "recommend[ ] new operating polices for adoption by the Mayor and/or Board of Aldermen," the position could easily be construed as one of policymaking and as influencing government. Factors seven and eight, the position, which reports directly to the mayor, inherently involves "contact with elected officials" and responsiveness to political leaders. Legg testified that, when considering whether to pursue the job as Director of Political Affairs, he considered that "I'd never been in the political arena before. It might be interesting." Def.'s Local Rule 9(c)(1) Statement Ex. GG, Legg Dep., p. 33. The fact that Legg later avoided meetings that were purely political does not change the fact that the *nature* of his job—geared to assisting a top political officeholder to develop and implement her objectives as mayor—was a policy-making position.

Legg understandably wants to eliminate the job description from consideration, because the document quite clearly demonstrates that the duties inherent in the job of Director of Administrative Affairs could reasonably require a shared ideology with the Mayor. The Director of Administrative Affairs is described as an immediate advisor and aide to the Mayor. Duties include conducting studies in order to recommend policy in a wide variety of areas, assisting the Mayor directly with executive oversight and coordination of departmental activities, planning and implementing fiscal goals and objectives, providing "advice and direction" to a variety of City personnel, and reviewing compliance with the budget. These functions are plainly tied to the Mayor's ability to achieve and implement the policies on which he or she was elected, which is the very "governmental end"

that the plurality in *Elrod* recognized as important enough to justify political patronage dismissals.

Mayor Valentine testified that her impulse to create the position stemmed from her desire to achieve her goals as Mayor. She testified that:

> As I sat in my office, starting on December 1, '95, and I searched for documents, such as job descriptions for all employees, Union contracts, there was nothing to be found in one location. It was hit or miss. It was tucked in a file here and there. The City was in chaos. The finance department was a total wreck, no accountability. And I started making a list of things that needed to be done and information to be gathered, and it was overwhelming, and I had committed myself to be a full-time mayor, and I knew I couldn't do it, so there was a need to have a helping hand in this job to have someone oversee below the mayor to get the house in order.

Valentine Dep. at 46–47. Further descriptions of the function of the Director of Administrative Affairs also show the policy-making nature of the position. Legg himself testified that the position called for an effective "trouble-shooter." Legg Dep. at 41. He further testified that his "job duties changed almost weekly" based on problems and priorities that would arise. *Id.* at 44, 52–53. Personnel Director Perry testified that "when the mayor was not available for a staff meeting or the department meeting, Mr. Legg would be the person. In the absence of the mayor, if there was any issue, you would go to Mr. Legg to address it during that time frame." Perry Dep. at 55. The Second Circuit has instructed that public employees with responsibilities that are not well defined or are of broad scope more likely function in policy-making positions not protected from political patronage dismissals by the First Amendment's guarantee of free speech. *Vona*, 119 F.3d at 207 (*citing Elrod*, 427 U.S. at 368, 96 S.Ct. 2673).

The Second Circuit's reasoning in *Vona* underscores the finding that the position of the Director of Administrative Affairs is a policy-making position. Just as the assistant attorneys in *Vona* served in an advisory capacity to the Department of Social Services,[2] so too did the Director of Administrative Affairs serve in an advisory capacity to the Mayor. In that role, the Director of Administrative Affairs may be privy to confidential information or sensitive opinions held by the Mayor that encompass political concerns. In fact, Valentine requested the establishment of the position precisely because she wanted someone to work "side by side with." Valentine Dep. at 47. Given a working relationship of this nature, the Mayor could likely wish to share information relating to the implementation of campaign promises or political concerns.

**2.** In *Vona,* the Second Circuit reasoned:

> "In *Branti,* the Supreme Court... held that the position of public defender was protected from patronage dismissals because a public defender's primary duty relates to the needs of his individual clients and not partisan politics and any confidential information received from this relationship has no bearing on partisan political concerns. Unlike the public defenders in *Branti,* assistant attorneys [to the Department of Social Services in the instant case] represent the County rather than individual clients. In addition, the inherent duties of the assistant attorneys may require them to be privy to confidential information held by the Commissioner and the Department. Since this information may encompass political and ideological concerns, assistant attorneys, unlike the public defenders in *Branti,* have inherent duties that may include political concerns."

*Vona,* 119 F.3d at 208 (internal quotations omitted).

Therefore, based on both job description and the testimony describing the functioning of the position, it is clear that the inherent duties of the Director of Administrative Affairs could rationally require that the Director share the political ideology of the Mayor. Legg therefore was not constitutionally protected from dismissal based on political patronage. Based on the evidence presented by the parties, no reasonably jury could find otherwise. In the absence of any material issue of fact for a jury's consideration, the Court grants the defendant's motion for summary judgment on the plaintiff's First Amendment and Fourteenth Amendment equal protection claims.

B. Fourteenth Amendment Due Process and Breach of Contract Claims

1. Property Interest Requirement

■■■ A threshold requirement for a procedural due process claim is that the plaintiff hold a protectable property or liberty interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*" *S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988) (plaintiff not deprived of property based on defendant city's premature termination of the parties' contract because the contract contained a provision allowing termination with no qualification). The inquiry for the Court is to determine whether the plaintiff has a contractual right giving rise to a "legitimate claim of entitlement" to dismissal only for cause. *Id.* at 966 (*quoting Roth*, 408 U.S. at 577, 92 S.Ct. 2701).

■■■ Under Connecticut law, an employee hired for a permanent or indefinite term is terminable at the will of the employer. *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 14, 662 A.2d 89 (Conn.1995). The default rule of employment-at-will can, however be modified by the agreement of the parties. *Id.* To prevail on a claim alleging " 'the existence of an implied agreement between the parties, the plaintiff [bears the] burden of proving by a fair preponderance of the evidence that [the employer] had agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause.' " *Id.* (*quoting D'Ulisse-Cupo v. Board of Dir. of Notre Dame High Sch.*, 202 Conn. 206, 212 n. 2, 520 A.2d 217 (1987)). Representations made in an employer's personnel manual may give rise to an express or implied contract. *Finley v. Aetna Life & Cas. Co.*, 202 Conn. 190, 198, 520 A.2d 208 (Conn.1987).

■■■ To determine the contents of an implied contract of employment, the factual circumstances of the parties' relationship must be examined:

[I]n order to find that an implied contract of employment incorporates specific representations orally made by the employer or contained in provisions in an employee manual, the trier of fact is required to find the following subordinate facts. Initially, the trier of fact is required to find that the employer's oral representations or issuance of a handbook to the employee was an "offer"— i.e., that it was a promise to the employee that, if the employee worked for the company, his or her employment would thereafter be governed by those oral or written statements, or both. If the oral representations and/or the handbook constitute an "offer," the trier of fact

then is required to find that the employee accepted that offer.

*Torosyan*, 234 Conn. at 13–14, 662 A.2d 89 (*citing, e.g.*, 1 Restatement (Second), Contracts § 45 and ill. 8 (1981)).

The City of Ansonia maintains an employee personnel manual, which provides that "permanent employees" are subject to dismissal by the Mayor only for cause[3] and only with both notice and a right of appeal. *See* Pl.'s Local 9(c)(1) Statement Ex. F, Ansonia Personnel Manual, Sec. 8.1, 8.3.3. There is no dispute between the parties that employees covered by the manual have a protectable property interest in the manual's protections from dismissal without cause. Rather, the dispute centers on whether Legg, as Director of Administrative Affairs, was a "permanent employee" and therefore entitled to the manual's protections.

Under Connecticut law, in the absence of any employment contract to the contrary, Legg is presumed to be an at-will employee. Legg can overcome that presumption only by proving by a fair preponderance of the evidence that the City of Ansonia agreed, either by words or action or conduct, to undertake some form of implied contractual commitment to him under which he could not be terminated without just cause. Legg argues, in essence, that the City made such a contractual commitment to him when it agreed that the personnel manual—and its protections from dismissal without cause—would apply to his service as Director of Administrative Affairs. To support this claim, he relies on the following evidence. First, he testified that the Personnel Director handed him the personnel manual at the outset of his employment, and that he believed himself to be a permanent employee. *See* Legg Dep. at 49, 55. Second, he points out that the manual applied to nearly all of the approximately 200 employees of the City of Ansonia. *See* Perry Dep. at 52–53. Third, Legg testified that he was given positive reviews on his job performance. *See* Legg Dep. at 47. Finally, Mayor Valentine submitted an affidavit affirming that she assessed Legg's performance during a six-month probationary period and thereafter determined him to be a permanent employee. *See* Valentine Aff. at ¶ 5. For the reasons that follow, the Court finds that these facts, taken in light of all the evidence in the record and construed most favorably to the plaintiff, are not sufficient as a matter of law to support plaintiff's claim that the City of Ansonia made a contractual agreement with Legg that the manual would apply to him.

First, it is immaterial whether or not Legg believed that the manual applied to him. The focus of the Court's inquiry is whether the City of Ansonia undertook some conduct from which it can be inferred that it intended to enter into a contract with Legg such that his position was covered by the manual. Legg testified that he does not recall Mayor Valentine or anyone else telling him that he was a permanent employee at the time he was hired. *See* Legg Dep. at 40. He further testified that at no time during his two and half year tenure as Director of Administrative Affairs did anyone tell him that he was a permanent employee. *See id.* at 76.

The plaintiff argues that because the manual applies to most City employees, the default rule is that employees are covered. While there may be instances where

---

**3.** "Cause," as defined by the personnel manual, includes such things as dishonesty in the performance of duties, alcohol consumption on the job, inefficiency, habitual absenteeism, and failure to obey a reasonable order. *See* Pl.'s Local 9(c)(1) Statement Ex. F, Ansonia Personnel Manual, Sec. 8.1.

silence would be sufficient to convey coverage of a broadly applicable employee manual, in this case silence cannot be equated with an offer by the City for the manual to apply. Based on the analysis in Part IIIA, *supra*, the position of Director of Administrative Affairs was plainly a policy-making position of a political nature. Nimmons and later Legg were viewed widely as the mayor's confidants and trouble-shooters. The Board of Aldermen approved the position at the Mayor's request, but took no action to make the position a permanent position defined by the manual or, indeed, even to extend its already-expired term. The Personnel Director testified that, as a matter of City policy, the manual did not apply to the mayor's staff, who were considered non-permanent employees and whose employment terms were dictated by the Mayor and approved by the Board of Aldermen. *See* Def.'s Local Rule 9(c)(1) Statement Ex. A, Perry Aff. ¶ 8. This policy was generated by the salary committee of the Board of Aldermen and explained orally to Perry when he became director of personnel. *See* Perry Dep. at 44–45. Perry explained that the Board reasoned that the mayor is not protected by the manual, but rather is answerable to the people, and so too should be the immediate mayoral staff. *Id.*

By the manual's own terms, Legg was not and never became a permanent employee. The manual defines a "permanent employee" as "an employee who successfully completes the probationary period and has been permanently appointed as provided in those rules and regulations." Pl.'s Local Rule 9(c)(1) Statement Ex. F, Ansonia Personnel Rules, Sec. 1B. Therefore, according to the manual, there are two requirements for becoming a permanent employee: one, the employee must successfully complete the probationary period, and two, he or she must have been appointed according to the manual's rules.

As to the first requirement of successful completion of probationary period, Mayor Valentine provided the following in an affidavit:

> In the six months following Mr. Legg's appointment, I reviewed Mr. Legg's work on a regular basis and determined, at the end of a six-month probationary period, that Mr. Legg's work was exemplary. Based on my familiarity with his performance, I determined that Mr. Legg should continue his employment as a non-probationary employee. Thereafter, he became a permanent employee and I treated him as such.

Valetine Aff. ¶ 5. The manual specifies, however, that the employee shall be notified in writing as to the successful completion of the probationary period. Pl.'s Local Rule 9(c)(1) Statement Ex. F, Ansonia Personnel Rules, Sec. 5.1. Legg states only that he was given favorable reviews from Valentine, and Valentine states only that she determined him to be a permanent employee. Valentine does not assert that she took any action in furtherance of her determination nor does she assert that she made any representation to Legg or anyone else to the effect that she had so determined. Neither Legg nor Valentine claim that she informed him that he had successfully completed a probationary period as defined in the manual and was, on that basis, considered a permanent employee entitled to the manual's protections.

Additionally, Legg's appointment to the position of Director of Administrative Affairs did not conform with process identified in the manual. The manual provides that permanent positions "whenever feasible" "shall be filled by promotion"; otherwise, they shall be filled by "transfer of employees as hereinafter provided" or "appointment from a reemployment list or a[sic] eligibility list as hereinafter provided." Pl.'s Local Rule 9(c)(1) Statement

Ex. F, Ansonia Personnel Rules, Sec. 4.1. First, Legg was not promoted to the position. Legg argues that because he worked in the finance department before his appointment to Director of Administrative Affairs, he was "promoted" to the position from his temporary assignment. However, at the time of his work in the finance department, Legg was not a temporary employee *of the City;* rather, he was an employee of a temporary employment agency. A temporary employee is defined as "any employee working nine weeks or less in a calendar year." *Id.* at Sec. 1.1E. Even if his work as a temp were encompassed by the term, Legg had been working in City's finance department as a temp for "approximately three and a half months" of 1997, more than the nine weeks allowable for designation as a temporary employee. Legg Dep. at 28. Therefore, there is no evidence from which it can be inferred that he was "promoted" to the position under the rules of the manual. Second, Legg argues that, alternatively, he was hired from a reemployment list or eligibility list. Perry, the City's personnel director, testified that an eligibility list is "a list of people who have properly applied for a posted position, an advertised position." Perry Dep. at 94. Plaintiff offers no evidence that the position was posted or advertised in any manner. Perry further testified that the mayor's staff positions, including the mayor's secretary and the Director of Administrative Affairs, were not posted positions because the positions were filled "at the mayor's sole discretion." *Id.* at 97. In fact, Mayor Valentine, who personally selected and appointed Legg, testified that to her knowledge Legg was not hired from posted position pursuant to an eligibility list. *See* Valentine Dep. at 103.[4]

Legg argues that it is inappropriate to hold him "to the letter of the Personnel Manual" because it was not strictly followed with respect to other employees. Pl.'s Mem. Law Opp. Summ. J. at p. 5. However, the plaintiff still bears the burden of demonstrating some evidence from which a jury could reasonably conclude that the City conferred this contractual right of the manual's protections to him. This brings the Court to Legg's only direct evidence—that is, the fact that Legg was handed a copy of the personnel manual by the personnel director when he started his work as Director of Administrative Affairs. Legg does not contend that at the time he was handed the manual there was any indication given that it was applicable to his position; rather, he testified that he was handed the document in connection with various personnel matters to which he attended at the outset of his tenure as Director of Administrative Affairs. *See* Legg Dep. at 48–49. Furthermore, the defendants provide a persuasive alternative explanation for why Legg was given the manual. Perry testified that Mr. Nimmons, Legg's predecessor in the position of Director of Administrative Affairs, was given the manual "not as an employee but he was given it because he was responsible for policy and procedures." Perry Dep. at 36. He then testified that:

> [Legg] very well may have [been given a copy of the personnel manual]. He was working out of the mayor's office, and everyone in the mayor's office, all—everyone who worked in the City since we started orientations, and that might have been started in '97, had been provided a copy of the personnel rules and regulations or at least told where they

Summ. J., p. 4–5.

---

4. Legg does not argue that he was "transferred" to the position. *See* Mem. Law Opp.

could go and see them in each department after Mr. Nimmons developed the notebook.

*Id.* at 36–37. Given that Legg's job was one of trouble-shooter and operational assistant to the Mayor, it is plausible that he would be given the employee manual as a reference. The Mayor herself would have been given the manual for this reason, but she was hardly protected from dismissal by the electorate.

In sum, Legg does not claim that he was told that he was hired into a position that was on track for permanent employee status, or that he achieved that status through successful completion of a probationary period, or that the manual applied to him. In short, there is insufficient evidence from which a fact-finder could infer an "offer" by the City of this term of employment for Legg. A reasonable jury would be required to speculate that the purpose of handing him the manual was to offer him employment under its protections notwithstanding its facial inapplicability to him.

 Legg argues in the alternative that he could only be terminated by the Board of Aldermen without cause because the City Charter reserves all non-delegated power to the Board of Aldermen, and the personnel manual, adopted by the Board of Aldermen, delegated to the Mayor the power to fire employees *for cause.* Therefore, the plaintiff argues, the Board of Aldermen reserved to itself the power to fire *without cause. See* Pl.'s Mem. Opp. Sum. J., p. 8–9. The Court is unpersuaded. A jury could not reasonably find by a fair preponderance of the evidence that the defendant City of Ansonia agreed, by this provision in its Charter reserving to the Board of Aldermen all non-delegated powers, to undertake a contractual commitment to Legg under which he could not be terminated without cause.

Therefore, because Legg has not met his burden of coming forward with evidence sufficient for a reasonable jury to find by a fair preponderance of the evidence that the City made an offer to Legg for the employee personnel manual and its protection from dismissal without cause to apply to him in his post, defendants are entitled to summary judgment on this claim.[5]

## IV. STATE–LAW CLAIMS

Having dismissed all of plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's state-law claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court therefore does not reach the merits of the defendant's motion for summary judgment on the following claims for relief: claim six (Conn.Gen. Stat.31–51q); claim seven (breach of contract); and claim eight (C.G.S. 31–70 et seq.).

## V. CONCLUSION

For the reasons set out above, the defendant's motion for summary judgment [Doc. # 37, 40] is GRANTED with respect to the plaintiff's federal claims, and the Court declines to exercise supplemental

---

5. Because the Court has found in favor of the defendants on summary judgment on the plaintiff's substantive federal claims, the Court need not consider the defendant's arguments that Mayor DellaVolpe is entitled to qualified immunity and that the plaintiff has failed to state a claim against the Mayor and the City under the *Monell* doctrine. In addition, because the Court has dismissed the plaintiff's substantive claims under 42 U.S.C. 1983, the Court dismisses the plaintiff's claims for punitive damages and attorneys' fees under that section.

jurisdiction over the plaintiff's state-law claims.

IT IS SO ORDERED.