Angela JOHNSON, Plaintiff,

v.

**VILLAGE OF DOLTON, an Illinois municipal corporation, and Mayor Ronnie Lewis, in his individual capacity, Defendants.**

No. 11 C 5219.

United States District Court,
N.D. Illinois,
Eastern Division.

March 27, 2013.

Terence J. Moran, Kalman D. Resnick, Karyn L. Bass Ehler, Mark Alan Cisek, Hughes Socol Piers Resnick & Dym, Ltd., Chicago, IL, for Plaintiff.

Gregory T. Mitchell, Law Office of Gregory T. Mitchell, P.C., Homewood, IL, Darcee Corinne Williams, Scariano, Himes and Petrarca, Chicago, IL, Kimberly M. Mitchell, Law Office of Gregory T. Mitchell, P.C., Homewood, IL, for Village of Dolton, an Illinois municipal corporation.

Gregory T. Mitchell, Law Office of Gregory T. Mitchell, P.C., Homewood, IL, Darcee Corinne Williams, Scariano, Himes and Petrarca, Chicago, IL, Kimberly M. Mitchell, Law Office of Gregory T. Mitchell, P.C., Homewood, IL, for Ronnie Lewis, Mayor, in his individual capacity.

## ORDER

REBECCA R. PALLMEYER, District Judge.

Plaintiff Angela Johnson worked for the Village of Dolton as Village Fire Inspector until her termination in December 2010. In this lawsuit, Johnson contends she was terminated for political reasons—specifically, her support for a slate of candidates for Board of Trustees favored by the Mayor's political rival. Defendants, the Village and its Mayor, Ronnie Lewis, have moved for summary judgment, arguing that the undisputed facts demonstrate that the Village's financial difficulties and Johnson's poor job performance, not politics, were the reasons for her discharge. For the reasons explained briefly here, the motion is denied.

### FACTS

William "Bill" Shaw was Mayor of the Village of Dolton from 1997 until his death from cancer in November 2008. (Pl.'s 56.1 Resp. [41] ¶ 2.) In May 2000, Plaintiff approached Mayor Shaw on the street to ask him to help her get a job with the Chicago Transit Authority. (*Id.* ¶ 8.) Instead, Mayor Shaw appointed Plaintiff to the position of Fire Inspector for the Village, a position for which Plaintiff had no prior training or experience. (*Id.* ¶¶ 5, 9–10.) Johnson was not certified as a firefighter, and Mayor Shaw instructed the Village's Fire Chief, Jerry McCollough, that despite her Fire Inspector title, the Chief should not assign any fire inspection duties to Johnson because she answered only to the Mayor. (*Id.* ¶¶ 10, 11.)

Ronnie Lewis became Acting Mayor upon Mayor Shaw's death, and then was elected to the position in April 2009. (*Id.* ¶ 12.) During 2009, Johnson performed fire inspections, but had no direct supervisor assigning work to her. (Johnson Dep., Ex. 5 to Defs.' 56.1 Stmt. [30–1], at 27, 28.) In October or November of that year, after Bert Herzog was appointed as Village Administrator, Herzog met with Plaintiff to discuss her job responsibilities and work schedule. (Pl.'s 56.1 Resp. ¶ 14.) Herzog also met with the Fire Chief, Jerry McCollough, who told him that Johnson had previously reported only to Mayor Shaw and that although he (McCollough) met with Johnson occasionally, she did not directly report to him. (McCollough Dep., Ex. 14 to Defs.' 56.1 Stmt. [33–4], at 34–35.) McCollough later told Herzog that Plaintiff had never been certified as a fire inspector, though she had taken a class and failed it twice. (Pl.'s 56.1 Resp. ¶ 16.) In her tenure as the Village's Fire Inspec-

tor, Johnson issued just one citation to a Village business, a local night club. (*Id.* ¶ 36.)

When he learned that Johnson had not been certified as a fire inspector and had not been observed doing any fire inspection work over an extended period, Herzog spoke to Mayor Lewis about temporarily reassigning Johnson to work as a housing inspector in the Village's Housing Department. (*Id.* ¶ 20.) Defendants assert that during this temporary reassignment, Johnson was to do only housing inspections, and perform no work for the Fire Department. (*Id.* ¶ 23.) Defendants' Statement of Facts also asserts, however, that when Herzog advised Chief McCollough about the decision to reassign Johnson, Herzog assured McCollough that Johnson could continue to help out with fire inspections on occasion, and McCollough asked about the possibility that Johnson might again get training for the work of fire inspection. (*Id.* ¶ 21.)[1] McCollough testified that after her reassignment to the Housing Department, he "saw less and less and less" of Johnson, but he acknowledged that after her reassignment, "there was a period of time where ... [Johnson] was doing both fire inspections and housing inspections...." (McCollough Dep. at 46.) The court concludes that whether or not Johnson was expected to devote herself full time to the Housing Department is disputed.

What is undisputed are the reasons for the reassignment. In September 2009, the Village of Dolton faced a financial crisis. Mayor Lewis reviewed all Village job positions and decided that the Fire Inspector position could be eliminated and the duties reassigned to the Fire Chief. (*Id.* ¶ 38.) Billy Morgan, the Director of the Housing Department, had advised Herzog that two housing inspectors were expected to retire soon, and the Department had a backlog of inspections to complete. (*Id.* ¶¶ 40, 41.) Johnson admits that Mayor Lewis assigned her to the Housing Department in order to "find something for her to do that would help the village fill a void without terminating her." (*Id.* ¶ 22.) In that Department, Morgan was Johnson's direct supervisor. (*Id.* ¶ 25.)[2] Herzog did not tell Morgan that Johnson's reassignment was temporary (*id.* ¶ 39), and it is undisputed that at some point it was expected that Johnson would be formally moved to the Housing Department. (*Id.* ¶ 24.)

In her new position, Johnson was required to work Monday through Friday from 9:00 a.m. to 5:00 p.m., and received housing inspection assignments from the Department's administrative assistant, Yolanda Dyson. (*Id.* ¶¶ 42, 43.) Johnson received training from mid-January 2010 through February 2010. (*Id.* ¶ 45.) In about March or April 2010, Ms. Dyson advised Billy Morgan that Johnson did not return to work after completing her Housing Department assignments; Plaintiff does not deny this, but she explains that after completing her inspections, she returned to Village Hall to relieve the Mayor's secretary from 2:00 until 3:30 p.m., and then worked from 3:30 p.m. to 5:00 p.m. in the Fire Department office. (*Id.* ¶ 46.) Morgan testified that he was unaware that Johnson was responsible for

---

1. Defendants assert that "Herzog said no to allowing Johnson to take additional classes," but the materials they cite do not support that assertion. (Defs.' 56.1 Resp. [47] ¶ 13, citing Herzog Dep., Ex. 6 to Defs.' 56.1 Stmt. [31–1], at 47; Morgan Dep., Ex. 10 to Defs.' 56.1 [33–2], at 42, 49–51; Lewis Dep., Ex. 17 to Defs.' 56.1 Stmt. [32–1], at 37, 38.).

2. Morgan was a long-time supporter of Mayor Shaw and served as acting chief of staff under both Mayor Shaw and his successor, Mayor Lewis, before being reassigned to the position of Director of Housing. (*Id.* ¶¶ 27–28.).

relieving the Mayor's secretary for her lunch break. (Morgan Dep. at 43.) Though Defendants contend that Plaintiff was expected to return to the Housing Department in the afternoon, they have acknowledged that after completing inspections, Johnson returned to Village Hall every day to relieve the Mayor's secretary for lunch, and that her work for the Mayor was always satisfactory. (Defs.' 56.1 Resp. ¶ 18.)

According to Mayor Lewis, Billy Morgan reported that inspectors responsible for training Johnson complained that she had refused to participate in the required training. (Lewis Dep. at 33.) Morgan himself testified, however, that the inspectors did not say anything to him about such problems. (Morgan Dep. at 46.) Bert Herzog similarly testified that Morgan had complained to Herzog that Johnson was not showing up regularly and was not performing inspections. (Herzog Dep. at 51.) Morgan acknowledged that he told Herzog he was sending him a copy of a disciplinary notice concerning Johnson, but Morgan denied ever having a meeting with Herzog to discuss Johnson's performance. (Morgan Dep. at 60, 61.)

Morgan testified that he did meet with Johnson in March or April to discuss her job performance and to explain that once she finished an inspection, he expected her to return to the Housing Department and perform clerical work there. He pointed out that she had not been doing this and recalled that she acknowledged the need to do so ("she said she knew"). (*Id.* at 49, 50.) Morgan says he then met again with Johnson in August 2010. At this second meeting, Morgan says he told Johnson she was not returning to the office as instructed, that he had heard she was spending time shopping during working hours, and that her inspections and her inspection reports were not being completed in a timely fashion. (*Id.* at 52, 53, 56.) Morgan testified that he presented Johnson with a written disciplinary notice dated August 3, 2010, but Johnson refused to sign it and walked away. (*Id.* at 36, 58.) [3] Morgan concluded that Johnson did not want to work as a housing inspector. (*Id.* at 70, 71.) Johnson denies that either of these meetings ever took place. (Johnson Dep. at 120–121.) She testified that she never saw the disciplinary notice until her deposition in this case and points out that there is no "employee refused to sign" notation on the disciplinary notice. (*Id.* at 115–121.)

Bert Herzog testified that "at some point the decision was made" that Johnson should be terminated. (Herzog Dep. at 63.) Mayor Lewis did not recall who made the recommendation that Johnson be terminated (Lewis Dep. at 44), but the parties agree that it was Lewis and Herzog who made the decision. (Defs.' 56.1 Resp. ¶ 37.) No contemporaneous document in the record confirms the date this occurred. Herzog's "best recollection" was that the decision was made in October 2010, but it was not implemented until December due to the Mayor's reluctance to carry out personnel cuts. (*Id.* at 71.) Morgan, purportedly Johnson's direct supervisor, testified that neither Herzog nor Lewis discussed the decision with him. (Morgan Dep. at 62.) Nor did anyone discuss the

---

**3.** The notice, not a model of clarity, lists the following infractions:

(1) Failure to return to Housing Dept after inspection

(2) Where ask to help with phone because two clerk where out

(3) Never return to office after inspection on any work day.

(Employee Discipline Notice, Ex. 12 to Defs.' 56.1 [28–2].) Morgan sent a copy of the notice to Bert Herzog, the Village Administrator, and to Casandra Bracey of the Village's Human Resources Department.

matter with Fire Chief McCollough. (Defs.' 56.1 Resp. ¶ 16.) Morgan recalls, however, that during the first week of November, Herzog told him that the decision had been made to terminate Plaintiff. (Morgan Aff., Ex. 11 to Defs.' 56.1 Stmt. [28–20], ¶ 10.) Plaintiff was terminated on December 10, 2010. (Dec. 10, 2010 letter, Ex. B to Pl.'s 56.1 Add'l. [42–2].)

When she received the termination letter, Plaintiff walked directly into the Mayor's office to ask him why she was being terminated; she testified that he told her it was because "I did not pass my [fire inspection] class." (Johnson Dep. at 91.) Plaintiff asserts that Mayor Lewis had never raised the matter of certification with her before. (Pl.'s 56.1 Add'l [42] ¶ 3.) Defendants dispute this, but the evidence they cite make no mention of any communication between Lewis and Johnson on the matter of her certification. (Defs.' 56.1 Resp. ¶ 3, citing Lewis Dep. at 15, 18, 22, 23.) It is undisputed that Johnson's predecessor as fire inspector, Dave Alvarado, also was not certified as a fire inspector. (Id. ¶ 4.) Lewis testified that when Johnson confronted him, asking about the reasons for her termination, he told her that she "never passed the [fire inspector certification] test," but also that "you're not doing your job." (Lewis Dep. at 63–64.)

Johnson contends that neither her job performance nor her certification status were reasons for her discharge, and that it was in fact motivated by politics. Defendants acknowledge that Johnson was a political supporter of the previous mayor, Mayor Bill Shaw. (Defs.' 56.1 Resp. ¶ 7.) They acknowledge, further, that Mayor Shaw's brother Robert Shaw was an ally of Mayor Lewis until the two men had a falling out. (Id. ¶ 8.) In the fall of 2010, Robert Shaw supported three candidates running for the Dolton Board of Trustees: William Lowe, Jr.; Valeria Stubbs; and Larry J. Bradley. (Id. ¶ 27.) Johnson

supported these candidates, as well; in November 2010, she signed and circulated nominating petitions for Lowe, Stubs, and Bradley, whom the parties refer to as "opposition candidates." (Id. ¶ 28.) Both Mayor Lewis and Bert Herzog became aware of this activity, Johnson asserts, in November 2010. At some point that month, Frank White, a janitor employed by the Village, was called to Mayor White's office, where he met with the Mayor and Bert Herzog. (White Aff., Ex. A to Pl.'s 56.1 Add'l [42–1], ¶ 2.) Herzog asked White about the circumstances in which White had signed a nominating petition for Lowe, Stubbs, and Bradley; specifically, Herzog wanted to know whether Plaintiff had asked him to sign the petition during work hours. (Id. ¶ 3.) White denied having signed the petition at work. He pointed out that his family members had also signed the petition and said that he had done so at home, after hours, when Johnson canvassed at his home. (Id. ¶ 4.) According to White, Herzog responded by saying, about Ms. Johnson, "She's got to go." (Id. ¶ 5.) It appeared to White that Mayor Lewis agreed with this statement. (Id. ¶ 6.) White says that a "short time after that meeting," he learned that Plaintiff had been terminated. (Id. ¶ 7.)

Defendants deny this. Herzog testified that prior to Johnson's termination, he had no information concerning her political activities. (Herzog Dep. at 49.) Lewis acknowledges that he spoke with Frank White about the nominating petition, but he testified that the conversation with White occurred outside of the office, "by the fountain," and that no one else was present. (Lewis Dep. at 57, 60.) Lewis recalled that Frank White told him that he (White) had "circulated a petition for the commissioner, 'that is, for Robert Shaw.'" (Id. at 61.) Lewis does not recall Johnson's name being mentioned in the conversation. (Id.) White himself was terminat-

ed in October 2011. (Defs.' 56.1 Resp. ¶ 39.)

### DISCUSSION

■ Unless political affiliation is reasonably required as one of her job qualifications, a public employee may not be terminated for her political activities. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 64, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *see Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *see also Elrod v. Burns,* 427 U.S. 347, 381, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The Seventh Circuit has concluded that political campaigning and involvement are politically protected expressions of speech under the First Amendment. *Brown v. U.S. Civil Serv. Comm'n,* 553 F.2d 531, 534 (7th Cir. 1977) (quoting *Elrod,* 427 U.S. at 370–71, 96 S.Ct. 2673).

■ To establish that her discharge was politically motivated, Plaintiff must establish that she engaged in constitutionally-protected activity and that her activity was a motivating factor in her termination. *Brown v. County of Cook,* 661 F.3d 333, 335 (7th Cir.2011) (the "motivating factor" analysis remains applicable to suits charging violations of First Amendment rights). Defendants here "readily admit" that circulating nominating petitions is protected activity, and that termination is a deprivation likely to deter political speech. (Defs.' Mot. for Summ. J. [24], at 7.) The sole issue on which they seek summary judgment is causation: they argue that no reasonable jury could find that Plaintiff's political activity was the "but for" cause of her termination. (*Id.*)

The standards for granting summary judgment are familiar. Such a motion should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The court views the facts and draws all reasonable inferences in favor of the non-moving party. *Naficy v. Illinois Dept. of Human Servs.,* 697 F.3d 504, 509 (7th Cir.2012). At the summary judgment stage, the court will not " 'make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.' " *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir.2007), *quoting Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir.2003).

■ With those standards in mind, the court considers the sole issue in this case: was Plaintiff Johnson's political activity a motivating factor in her termination? Although Defendants vigorously argue otherwise, the court concludes there are disputes of fact concerning this issue. Frank White's affidavit describes a meeting in the Mayor's office in November 2010, shortly before Johnson's discharge. White recalls that Mayor Lewis and Herzog were present for this meeting, and that Mayor Lewis questioned White about his signature on the nominating petitions for the "opposition" slate. White's description of the meeting suggests that Lewis and Herzog may have been concerned that Johnson had gathered signatures for the petition during working hours—a potentially legitimate concern, in light of her record of reported suspicious absences. After White assured Lewis that he (and his family members) signed the petition when Johnson canvassed in their neighborhood, however, Herzog reportedly said, "She's got to go." A reasonable jury could infer that Herzog (and Lewis) believed Johnson's political activity was the trigger for the decision to fire her.

■ Herzog denies participating in any such meeting. Lewis, for his part, does acknowledge speaking to White about the nominating petition, but testified that

he met with White alone about the matter and made no mention of Johnson. In asking the court to credit their accounts, and not that of Frank White, Defendants effectively invite the court to make a credibility determination. The court declines the invitation. Defendants are correct that the court is confined, on summary judgment, to consider admissible evidence, but White's account of the statement made by Bert Herzog, in Mayor Lewis's presence, is admissible for the very reason that Defendants themselves identify: Herzog's statement is that of a party opponent, admissible pursuant to FED.R.EVID. 801(d)(2)(D). (Defs.' Reply Mem. [46] at 3.) It was made by the Village Administrator, about a matter within the scope of his responsibilities in administering the Village's employees. Contrary to Defendants' argument (*id.* at 5), the Rule does not require, as a condition for admissibility, that Herzog's statement be inconsistent with Defendants' trial position. In fact, however, White's account of Herzog's statement is indeed inconsistent with the position that Defendants are taking now: Defendants contend that Herzog and Lewis were unaware of Plaintiff's political activities at the time of her termination and were not motivated by those activities when they made the discharge decision.

Defendants also emphasize discrepancies between White's account of the meeting with Mayor Lewis and the account that Johnson herself offered in her complaint. Defendants cite *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996), where the court observed that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." This well-established principle permits the court to disregard a statement in an affidavit that attempts to "remedy" or alter testimony of the affiant that may have been damaging. The principle is not implicated here, however; White was not deposed in this case. The fact that his account of the meeting differs from the one Plaintiff herself offered may shed light on her memory or motivation, but it does not support striking his own non-hearsay evidence.

Defendants point to ample evidence of legitimate, non-political reasons for Plaintiff's termination: the Village's dire financial circumstances; Plaintiff's reported record of absences from work; and her apparent lack of interest in performing the housing inspections to which she was assigned. Plaintiff denies the criticisms of her performance, and asserts that when she asked Mayor Lewis why she was being fired, he told her it was because of her failure to pass a fire inspection certification test years earlier. For his part, Mayor Lewis testified that he told Plaintiff she was being fired for "not doing her job," but he acknowledged that he also cited the fire inspection certification—an odd matter to mention if, as Defendants insist, Plaintiff had been removed from the fire inspection role and assigned full-time to housing inspection duties. In any event, Plaintiff's alleged performance problems had existed unabated for months (perhaps for years). The jury may conclude that the Village would have continued putting up with Johnson had she not begun campaign efforts for opponents of the Mayor.

The court recognizes the irony in this conclusion. If Defendants are to be believed, Angela Johnson's employment by the Village of Dolton confirms the wisdom of the Supreme Court's prohibition on political hiring and firing. The Village appears to have been ill-served by the previous Mayor's decision to hire Plaintiff for the position of Fire Inspector after a chance encounter. She had no training or experience relevant to the position and had never even worked as a firefighter. She

failed two efforts to complete the training and certification for the Fire Inspector position, and her performance appears to have been lackluster at best. She reported only to the Mayor, and the Fire Chief himself was prohibited from giving her any assignments. In ten years as Fire Inspector, Johnson issued exactly one citation— to a nightclub, after business hours. All of these are uncontested facts. After the death of Plaintiff's patron and her reassignment to the Housing Department, one might have expected Village officials to monitor Plaintiff's productivity and take swift action if it was unsatisfactory. Instead, months went by while the taxpayers continued paying Plaintiff's salary. When Defendants finally terminated her, they did so under circumstances that at least suggest political considerations were at play.

When this case proceeds to trial, Plaintiff may well be unsuccessful in proving that her discharge was politically motivated. Alternatively, Defendants may be able to establish a "mixed motive" case, if they can demonstrate that regardless of political considerations, Plaintiff would have been fired in December 2010, or soon after, for legitimate budget or performance reasons. On this record, however, their motion for summary judgment [24, 25] is denied.